UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/26/2017

UNITED STATES OF AMERICA

- against -

DAVIT MIRZOYAN,

Defendant.

**MEMORANDUM
OPINION & ORDER**

10 Cr. 895 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Indictment 10 Cr. 895 (PGG) charges twenty-eight individuals with participating in a racketeering enterprise that operated a massive Medicare fraud scheme nationwide from 2006 to September 2010. (Indictment (Dkt. No. 3)) The Defendants – a large and close-knit group composed primarily of Armenian nationals – operated a highly sophisticated network of scores of phony medical clinics purportedly located in at least 25 states. (Mirzoyan PSR (Dkt. No. 916) ¶¶ 47, 50, 57) The clinics existed only on paper; there were no doctors and there were no patients. (Id. ¶ 50) The Defendants submitted more than $100 million in fraudulent bills to Medicare – for medical care that was never provided – using the stolen identities of hundreds of doctors and thousands of patients. (Id. ¶¶ 50-57)

Medicare generally detected a clinic's fraudulent nature after several months, in part because billed-for procedures did not match doctors' specialties. (See id. ¶¶ 55-56; Indictment (Dkt. No. 3) ¶ 23(b)) But by the time fraud was detected, Medicare often would have paid out hundreds of thousands on fraudulent claims. (Mirzoyan PSR (Dkt. No. 916) ¶ 56) Although Medicare took steps to freeze a fraudulent clinic's bank accounts once fraud had been detected (Id. ¶ 58; Oct. 8, 2014 Mirzoyan Aff. (Dkt. No. 847-1) ¶ 39), the Defendants nonetheless succeeded in fraudulently extracting tens of millions of dollars in payments from

Medicare for medical care that had never been provided. (Mirzoyan PSR (Dkt. No. 916) ¶ 57)
And even when Medicare determined that one of the Defendants' phantom clinics was phony,
the Defendants simply replaced that clinic with another phony clinic. (Id. ¶ 56; Indictment (Dkt.
No. 3) ¶ 24) This pattern continued for four years, until the Defendants' arrests in October 2010.
(Mirzoyan PSR (Dkt. No. 916) ¶ 97)

Given that Medicare would take action to freeze a fraudulent clinic's bank
account (Oct. 8, 2014 Mirzoyan Aff. (Dkt. No. 847-1) ¶ 39), it was critically important to the
success of the racketeering enterprise's Medicare fraud scheme that fraudulent proceeds be
quickly transferred from a phony clinic's bank account to other accounts. (Feb. 13, 2017
Sentencing Hearing Transcript ("Hrg. Tr.") (Dkt. No. 911) at 21) Accordingly, the enterprise's
money laundering activities were essential and integral to the Medicare fraud scheme. The
leader of the Medicare fraud scheme – Defendant Davit Mirzoyan – employed others to travel
throughout the United States to open bank accounts in false names, using false identification
documents. (Mirzoyan PSR (Dkt. No. 916) ¶¶ 58, 78) Fraudulent proceeds were then
transferred from the phony clinics' bank accounts to bank accounts opened in the names of shell
companies or other phony clinics, jewelry stores, and check cashing and other businesses. (Id. ¶
64; Indictment (Dkt. No. 3) ¶ 22; Hrg. Tr. (Dkt. No. 911) at 21) Millions of dollars in fraudulent
proceeds were converted into chips at a Las Vegas casino (Mirzoyan PSR (Dkt. No. 916) ¶ 64),
and fraudulent proceeds were also sent to Armenia. (Id. ¶¶ 59, 70)

Of the twenty-eight defendants charged in Indictment 10 Cr. 895, twenty-five
pleaded guilty.[1] Nineteen defendants pleaded guilty to RICO conspiracy, while the remaining

---

[1] The Government submitted a nolle prosequi as to Defendants Michael Dobrushin and Aron
Chervin. Defendant Gagik Kyurkchyan is a fugitive. (Mirzoyan PSR (Dkt. No. 916) ¶¶ 40-41,
43)

defendants pleaded guilty to conspiracy to commit health care fraud, conspiracy to commit bank fraud, conspiracy to make false bank entries, conspiracy to commit money laundering, structuring financial transactions, and misprision of a felony. (Mirzoyan PSR (Dkt. No. 916) ¶¶ 18-39; Markosian Plea Tr. (Dkt. No. 791) at 15; Khachaturyan Plea Tr. (Dkt. No. 925) at 23-24; Grigorian Plea Tr. (Dkt. No. 734) at 24) Twenty-three defendants have been sentenced to date. Those defendants involved in the core criminal activity of the racketeering enterprise – Medicare fraud – have generally been sentenced at the top of the applicable Sentencing Guidelines range, reflecting the fact that the sentence imposed must be sufficient to deter others from engaging in this type of highly sophisticated and damaging criminal activity. Two defendants are still awaiting sentence: Davit Mirzoyan and Gayane Khachaturyan,[2] a Government cooperator.

Davit Mirzoyan was the Los Angeles-based head of the racketeering enterprise, which the Government refers to as the Mirzoyan-Terdjanian organization (the "MTO"). It was this racketeering enterprise that stole the identities of hundreds of doctors and thousands of patients, set up scores of phony medical clinics, billed Medicare for more than $100 million for treatment that never took place, fraudulently extracted tens of millions of dollars from Medicare, and laundered the fraudulent proceeds through numerous bank accounts.

On October 26, 2012 – about a month before his trial was to begin – Mirzoyan pleaded guilty to (1) racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); (2) conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1347, 1349; (3) conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344, 1349; (4) conspiracy to commit money

---

[2] In Indictment 10 Cr. 895, as well as in certain other documents filed in this matter, Khachaturyan's name has been spelled as "Khatchaturyan." When she testified at the February 13, 2017 sentencing hearing, however, Khachaturyan spelled her name for the court reporter as "Khachaturyan." (Hrg. Tr. (Dkt. No. 911) at 56) Accordingly, the Court uses that spelling in this opinion.

laundering, in violation of 18 U.S.C. § 1956(h); and (5) conspiracy to commit fraud in connection with identity theft, in violation of 18 U.S.C. § 371. (Plea Tr. (Dkt. No. 920) at 23-24) There was no plea agreement. (Id. at 2-3)

Mirzoyan's sentencing has been long-delayed. Initially, sentencing was delayed as a result of complex disputes between the parties as to the proper application of the Sentencing Guidelines. The parties later entered into stipulations concerning the application of the Sentencing Guidelines to Mirzoyan's offenses, but the Court became concerned that these stipulations did not properly reflect Mirzoyan's criminal conduct or account for all applicable Guidelines enhancements.

For the reasons stated below, this Court concludes that the November 1, 2016 Guidelines Manual should be utilized in sentencing Mirzoyan, and that the applicable sentencing range under the 2016 Manual is 292 to 365 months' imprisonment.

## BACKGROUND

**I.     THE GOVERNMENT'S *PIMENTEL* LETTER**

On May 1, 2012 – several months before Mirzoyan's guilty plea – the Government sent a Pimentel letter to his counsel setting forth the Government's understanding of how the Sentencing Guidelines apply to Mirzoyan's offenses.[3] (See May 1, 2012 Gov't Ltr. (Dkt. No. 917)) See also United States v. Pimentel, 932 F.2d 1029 (2d Cir. 1991).

In the Pimentel letter, the Government states that – although the Guidelines call for a sentence of life imprisonment – Mirzoyan's sentence is capped at the statutory maximum of 80 years. (Id. at 5) The Government's Guidelines calculations are premised on a grouping

---

[3] In preparing the Pimentel letter, the Government utilized the November 1, 2010 Sentencing Guidelines Manual. (May 1, 2012 Gov't Ltr. (Dkt. No. 917) at 3)

analysis, pursuant to U.S.S.G. § 3D1.2(d). "Group A" addresses the fraud-related conduct that is the subject of Counts One, Two, Three, Five, and Six of the Indictment, while "Group B" addresses the money laundering conduct set forth in Counts One and Four. (Id. at 3-5)

As to Group A, the Government calculates an offense level of 49 premised on the following enhancements to the base offense level:

> a twenty-six level increase because the loss amount is greater than $100 million but less than $200 million;
>
> a six-level increase because the offense involved 250 or more victims;
>
> a two-level increase because the offense involved sophisticated means;
>
> a two-level increase premised on the unauthorized transfer or use of any means of identification unlawfully to produce or obtain other means of identification;
>
> a two-level increase because Mirzoyan derived more than $1 million in gross receipts from one or more financial institutions as a result of his offenses; and
>
> a four-level increase because Mirzoyan was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.

(Id. at 3-4)

As to Group B – which addresses Mirzoyan's money laundering-related conduct – the Government calculates an offense level of 42 based on the following enhancements to the base offense level:

> a twenty-six level increase based on a loss amount of between $100 and $200 million;
>
> a four-level increase because Mirzoyan was in the business of laundering funds; and
>
> a four-level increase based on Mirzoyan's role in the offense.

(Id. at 4)

Because Group A yields a higher offense level, the Government relies on the Group A calculations in contending that Mirzoyan faces a Guidelines sentence of life imprisonment, subject to a statutory maximum of 80 years. (Id. at 5)

## II.  THE PRE-SENTENCE REPORT

In the Pre-Sentence Report ("PSR"), the Probation Office concludes that Counts 1, 2, 3 and 5 – RICO conspiracy, health care fraud conspiracy, bank fraud conspiracy, and conspiracy to commit fraud in connection with identity theft – should be grouped together pursuant to U.S.S.G. § 3D1.2(d), because the offense level of each count is based on the total amount of loss.[4]  (Mirzoyan PSR (Dkt. No. 916) ¶ 108)  The Probation Office further concludes that Count 4 – conspiracy to commit money laundering – should be "grouped with all of the other counts" pursuant to U.S.S.G. § 2S1.1, comment. (n.6), and § 3D1.2(c), "because the money laundering offense is related to the funds derived from the health care and bank fraud offenses." Id.  Citing U.S.S.G. § 3D1.3(a), which provides that – where counts have been grouped pursuant to  § 3D1.2(c) – "the highest offense level of the counts in the Group" must be used, the Probation Office concludes that the Guidelines provision for money laundering – U.S.S.G. § 2S1.1 – is applicable, because use of this provision yields the highest offense level.  (Mirzoyan PSR (Dkt. No. 916) ¶ 109)  Accordingly, the PSR uses the money laundering Guidelines provision to calculate the offense level for all five offenses Mirzoyan pled guilty to.  (Id.)

Pursuant to U.S.S.G § 2S1.1(a)(1), the Probation Office calculates the base offense for the money laundering guideline using the "offense level for the underlying [fraud] offense from which the laundered funds were derived," because Mirzoyan "committed the

---

[4] In preparing the PSR, the Probation Office utilized the November 1, 2012 Sentencing Guidelines Manual.  (Mirzoyan PSR (Dkt. No. 916) ¶ 107)

underlying offenses and the offense level for that offense can be determined." (Mirzoyan PSR (Dkt. No. 916) ¶ 110) The Probation Office therefore applies a base offense level of 7 pursuant to U.S.S.G. § 2B1.1, and then imposes the following Guidelines enhancements:

> a twenty-six level increase based on a loss amount of between $100 million and $200 million;
>
> a six-level increase because the offense involved more than 250 victims;
>
> a two-level increase because the offense involved sophisticated means;
>
> a two-level increase because the offense involved the unauthorized transfer or use of a means of identification unlawfully to produce or obtain other means of identification; and
>
> a two-level increase because Mirzoyan derived more than $1 million in gross receipts.

(See id. ¶¶ 111-117)

The Probation Office also imposes a two-level increase because Mirzoyan had been "convicted under 18 USC 1956." (Id. ¶ 119 (citing U.S.S.G. § 2S1.1(b)(2)(B))). Finally, the PSR provides for a four-level adjustment based on Mirzoyan's role in the offense, because he "orchestrated the fraud and was the leader of this extensive conspiracy," and "directed the actions of five or more participants." (Id. ¶ 121 (citing U.S.S.G. § 3B1.1(a)))

After a three level reduction for acceptance of responsibility, the PSR arrives at a total offense level of 48. (Id. ¶¶ 124-125)

The PSR imposes one criminal history point based on Mirzoyan's January 11, 2010 conviction for driving under the influence, and two points because Mirzoyan was on probation at the time he committed the instant offenses. Accordingly, Mirzoyan falls within Criminal History Category II. (Id. ¶¶ 128-133)

The PSR concludes that with a total offense level of 48 and a Criminal History Category of II, Mirzoyan faces a Guidelines range of life imprisonment, capped by a statutory maximum term of imprisonment on all five counts of 75 years' imprisonment. (Id. ¶ 159)

## III.  THE PARTIES' SENTENCING AGREEMENT

Prior to the scheduled sentencing date, the parties made numerous submissions reflecting countless disputes regarding loss amount and other complex issues under the Sentencing Guidelines. (See, e.g., June 3, 2013 Def. Ltr. (Dkt. No. 682); June 10, 2013 Gov't Ltr. (Dkt. No. 683); June 14, 2013 Def. Ltr. (Dkt. No. 687); June 18, 2013 Conf. Tr. (Dkt. No. 706); July 9, 2013 Gov't Ltr. (Dkt. No. 701); July 29, 2013 Def. Ltr. (Dkt. No. 710); Aug. 14, 2013 Def. Ltr. (Dkt. No 720); Aug. 29, 2013 Gov't Ltr. (Dkt. No. 806); Sept. 30, 2013 Def. Ltr. (Dkt. No. 772); Dec. 6, 2013 Conf. Tr. (Dkt. No. 776); Jan. 8, 2014 Def. Ltr. (Dkt. No. 787); Jan. 20, 2014 Def. Ltr. (Dkt. No. 788))  As to loss amount, Mirzoyan contended that he should be sentenced on the basis of Medicare's out-of-pocket loss.  Although this Court repeatedly stated that "loss" for purposes of U.S.S.G. § 2B1.1(b)(1) "'is the greater of actual loss or intended loss'" (see, e.g., June 11, 2014 Order (Dkt. No. 804) at 8-9 (quoting U.S.S.G. § 2B1.1(b)(1))), Mirzoyan nonetheless insisted that this Court should look to Medicare's "actual loss."[5]  (See, e.g., June 3, 2013 Def. Ltr. (Dkt. No. 682); June 18, 2013 Conf. Tr. (Dkt. No. 706) at 5-9; July 29, 2013 Def. Ltr. (Dkt. No. 710) at 1-2; Sept. 30, 2013 Def. Ltr. (Dkt. No. 772) at 3 n.4)

In a June 11, 2014 order, after numerous submissions and court conferences had not led to a resolution of the parties' disputes regarding application of the Sentencing Guidelines,

---

[5]  Mirzoyan also requested that this Court issue subpoenas for bank records concerning each of the more than 100 phantom medical clinics "operated" by the Defendants, so that Mirzoyan could demonstrate at sentencing the "actual loss" suffered by Medicare. (See June 11, 2004 Order (Dkt. No. 804) at 2)

the Court set the matter down for a <u>Fatico</u> hearing on June 17, 2014. (June 11, 2014 Order (Dkt. No. 804) at 13) The Court informed the parties that it would hear evidence concerning the following issues: "(1) the number of Medicare clinics alleged to be involved in fraud that are attributable to Mirzoyan; (2) the loss amount attributable to Mirzoyan; and (3) Mirzoyan's role in the offense." (<u>Id.</u>)

A.   **The Sentencing Agreement's Guidelines Stipulations**

On June 16, 2014 – the day before the scheduled <u>Fatico</u> hearing – the parties entered into an agreement concerning the application of the Sentencing Guidelines to Mirzoyan's offenses. (June 16, 2014 Gov't Ltr. (Dkt. No. 918) (the "Sentencing Agreement")) The Sentencing Agreement provides for a stipulated total offense level of 34 and a stipulated Guidelines range of 168 to 210 months' imprisonment.[6] (<u>See id.</u> at 4) This represents a drastic change from the total offense levels set forth in the Government's <u>Pimentel</u> letter (45) and the PSR (48), both of which provide for a Guidelines range of life imprisonment, subject to the statutory maximum of 75 to 80 years' imprisonment. (<u>See</u> May 1, 2012 Gov't Ltr. (Dkt. No. 917) at 3-5; Mirzoyan PSR (Dkt. No. 916) ¶¶ 125, 159)

The Sentencing Agreement arrives at a much lower total offense level and Guidelines range by deviating significantly from the analyses and calculations set forth in the Government's <u>Pimentel</u> letter and the PSR. The Sentencing Agreement groups together the fraud and money laundering offenses, but calculates the total offense level by using the Guidelines provisions for fraud rather than the Guidelines provisions applicable to money laundering. (<u>Id.</u> at 3-4) The Sentencing Agreement also: (1) uses a loss amount of between $20

---

[6] The calculations in the Sentencing Agreement are premised on the November 1, 2010 Guidelines Manual. (Sentencing Agreement (Dkt. No. 918) at 3)

million and $50 million rather than the $100 to $200 million range used in the <u>Pimentel</u> letter and the PSR, resulting in a twenty-two level increase rather than the twenty-six level increase set forth in the <u>Pimentel</u> letter and the PSR; (2) imposes a two-level increase for ten or more victims rather than the six-level increase utilized in the <u>Pimentel</u> letter and the PSR for 250 or more victims; (3) includes no enhancement for unlawful use of a means of identification to obtain another means of identification; and (4) includes no enhancement for Mirzoyan's gross receipt of more than $1 million in fraudulent proceeds from a financial institution. (<u>See id.</u>)

After applying a three-level reduction for acceptance of responsibility, the Sentencing Agreement calculates an offense level of 34. (<u>Id.</u> at 3-4) Because Mirzoyan's Criminal History Category is II, the Sentencing Agreement concludes that the applicable Guidelines range is 168 to 210 months' imprisonment. (<u>Id.</u> at 4)[7]

The Sentencing Agreement further provides that "neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party . . . suggest that the Court <u>sua sponte</u> consider any such departure or adjustment." (<u>Id.</u> at 4) The parties explicitly acknowledge, however, that the Court is not bound by their Guidelines

---

[7] The Sentencing Agreement also states that the statutory maximum sentence here is 85 years' imprisonment. (Sentencing Agreement (Dkt. No. 918) at 2) The PSR states, however, that Mirzoyan's statutory maximum sentence is 75 years' imprisonment. (Mirzoyan PSR (Dkt. No. 916) ¶¶ 158-159) The discrepancy arises from Mirzoyan's plea to Count Four, conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). Section 1956(h) provides that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h). Section 1956(a) provides for a maximum term of imprisonment of twenty years, while Section 1957(b) provides for a maximum term of imprisonment of ten years. 18 U.S.C. §§ 1956(a), 1957(b).

Mirzoyan was told at the time of his guilty plea that he faced a maximum sentence of ten years' imprisonment on Count Four. (<u>See</u> Plea Tr. (Dkt. No. 920) at 13-14) Accordingly, this Court has assumed – for purposes of determining Mirzoyan's sentence – that the maximum term of imprisonment he faces on Count Four is ten years, and that the statutory maximum term of imprisonment he faces on all counts of conviction is 75 years.

stipulations, and both sides "reserve the right" to respond to inquiries from the Court concerning

application of the Guidelines:

> It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts. In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated above, or contemplates any sentence outside of the Guidelines ranges calculated by the parties, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

(Id. at 5)

### B. The Court's Response to the Sentencing Agreement's Guidelines Stipulations

Because of inconsistencies between the Sentencing Agreement's Guidelines

stipulations and (1) the Government's Pimentel letter; (2) the PSR; and (3) the Government's

prior representations to the Court concerning, inter alia, loss amount, number of victims, the role

of identity fraud and money laundering in the Medicare fraud scheme, and Mirzoyan's role in the

offense, the Court issued an order on June 17, 2014 directing the parties to make submissions

explaining and justifying their Guidelines stipulations:

> Pursuant to U.S.S.G. § 6B1.4, the parties are directed to explain why the court should reject the Guidelines analysis set forth in the PSR and instead adopt the Guidelines [stipulations] set forth in the June 16, 2014 agreement including, in particular, (1) a loss amount between $20 million and $50 million; and (2) a two-level enhancement for the number of victims. The parties are also directed to explain why (1) the Court should apply the November 1, 2010 Guidelines manual, as opposed to the November 1, 2009 Guidelines Manual; and (2) the Court should not apply the money laundering Guidelines provision set forth in U.S.S.G. § 2S1.1, given that Defendant pleaded guilty to a money laundering offense.

(Dkt. No. 811)

On August 13, 2014, this Court conducted a lengthy conference to discuss the

Guidelines stipulations in the Sentencing Agreement. (Aug. 13, 2014 Conf. Tr. (Dkt. No. 838))

At the outset of the conference, this Court stated that

there are a number of aspects [of] the sentencing agreement that I'm deeply troubled by. First, I believe that the sentencing agreement flies in the face of countless representations the government has made in the past [–] over the more than three years that this matter has been pending [–] about Mr. Mirzoyan's culpability and his role in the offense.

The sentencing agreement also contradicts numerous statements in the presentence report, statements that were the basis on which more than 20 people have been sentenced in this case.

The factual statement included in the presentence report was undoubtedly supplied to the probation office by the government, and I relied on that factual statement in sentencing numerous co-defendants.

The sentencing agreement is also not consistent with admissions made by co-defendants at the time of guilty pleas and in connection with correspondence to the Court. Nor is it consistent with the government's accounts of co-defendants' role[s] in the offense.

In short, many aspects of the parties' agreement appear to me to contradict the factual record and involve a facially improper application of the guidelines.

I am putting the parties on notice that I will not sentence Mr. Mirzoyan on the basis of stipulated "facts" that have no connection to reality. The commentary accompanying Section 6B1.4 of the [G]uidelines states, and I quote: "The Court is not obligated to accept the stipulation of the parties" and "in determining the factual basis for the sentence, the Court will consider the stipulation together with the results of the presentence investigation and any other relevant information."
. . . .

The commentary also states that "it is not appropriate for the parties to stipulate to misleading or non-existent facts, even when both parties are willing to assume the existence of such 'facts' for purposes of the litigation."

(Aug. 13, 2014 Conf. Tr. (Dkt. No. 838) at 6-7) (quoting U.S.S.G. § 6B1.4, intro. comment.)

The Court then reviewed in detail each area in which the Sentencing Agreement deviated from the Pimentel letter and the PSR – including loss amount, number of victims, the applicability of the money laundering Guidelines provision and the means of identification enhancement – and explained at length how and why the parties' Guidelines stipulations contradicted both the Government's repeated representations over three years of litigation and

the evidence before the Court. (See Aug. 13, 2014 Conf. Tr. (Dkt. No. 838) at 7-36) The Court then directed the parties to review the transcript and to advise the Court of "how they wish to proceed, either in terms of submitting additional evidence, or requesting an evidentiary hearing if they deem that appropriate." (Id. at 36)

In subsequent letters to the Court, the parties reaffirmed their support for the Guidelines stipulations set forth in the Sentencing Agreement. (See, e.g., Dkt. Nos. 847, 856) Many of the parties' arguments were not responsive to the concerns expressed by the Court at the August 13, 2014 conference, however.[8]

At a December 20, 2016 conference, the Court reiterated that "the record doesn't . . . support a number of the stipulations the parties have reached," that the Court "can't on the present record accept those stipulations," and that "if the parties want to press their stipulation [on] me, I'm going to have to hear evidence that supports it." (Dec. 20, 2016 Conf. Tr. (Dkt. No. 897) at 4-17, 25, 28)

In a January 13, 2017 letter, the Government acknowledged both the difficulties posed by the Sentencing Agreement's Guidelines stipulations and its obligation to respond to inquiries from the Court concerning Guidelines calculations:

> At the outset, the Government understands the Court's frustration and recognizes its observation that the parties, in reaching stipulations in the Sentencing Agreement, may have been guided too much by a desire to reach a Guidelines range that could reflect an appropriate sentence (as opposed to reaching a higher range and agreeing to a downward variance). But the Government also recognizes that it is, nonetheless, bound by the

---

[8] For example, the Court explained at the August 13, 2014 conference that Mirzoyan need not have personally participated in the theft of victim's identities in order to be held responsible for that conduct under U.S.S.G. § 2B1.1(b)(2), because a defendant may be held liable under the Guidelines for the reasonably foreseeable acts of co-conspirators. (See Aug. 13, 2014 Conf. Tr. (Dkt. No. 838) at 14-16 (citing U.S.S.G. § 1B1.3(a))) In subsequent correspondence, neither side attempted to explain why Mirzoyan should be held liable for 10 victims, when it was undisputed that Mirzoyan and his co-conspirators had stolen the identities of hundreds of doctors and thousands of patients and used these stolen identities to perpetrate the Medicare fraud scheme.

Sentencing Agreement and feels obligated to adhere to it. Unlike the Court, which is obviously not bound by parties' sentencing stipulations, the Government has an obligation to adhere to its agreements even when those agreements may later be determined to have been based on legal errors or misapplications of the Guidelines. That is, unfortunately, the position in which the Government finds itself here.

The Second Circuit Court of Appeals has counseled that in such circumstances, the Government is constrained from advocating a position at odds with the parties' agreement (or else it will be in breach); but, that when it is the Court, and not the Government, who raises questions about Guidelines calculations and adjustments, the Government can and should provide the requested factual and legal information to the Court as this "is an essential function of the government at sentencing."

. . . .

Accordingly, in keeping with Second Circuit authority, the terms of the Sentencing Agreement, and the Government's duty of candor to the Court, the Government provides the following explanations about the evidence (or lack thereof) with respect to each of the sentencing issues the Court has identified. And after reviewing the representations set forth below, if the Court directs the Government to present evidence at a hearing, we will be prepared to do so.

(Jan. 13, 2017 Gov't Ltr. (Dkt. No. 902) at 1-2 (quoting United States v. Vaval, 404 F.3d 144,

154 (2d Cir. 2005) (footnotes omitted)))

As to loss amount, the Government's January 13, 2017 letter goes on to state that

"there is evidence – and the Government has always maintained – that Mirzoyan's conspiracy

billed Medicare in a total amount of approximately $105 million." (Id. at 3) However, the

Government also maintains that – were the Court to credit Mirzoyan's representations

concerning his knowledge of Medicare fee schedules and reimbursement practices – he knew

that he would obtain substantially less than the $105 million that was billed to Medicare. In this

context, the stipulated range of $20 million to $50 million was agreed to in "good[]faith."[9] (Id.)

---

[9] In the January 13, 2017 letter, the Government represents "that Medicare paid out approximately $32.6 million to clinics in connection with Mirzoyan's conspiracy, and recalled or suspended an additional $6.6 million because of the detection of the fraud, for a total of $39.2 million." (Jan. 13, 2017 Gov't Ltr. (Dkt. No. 902) at 3 n.4)

As to number of victims, the Government states that it "is not aware of any factual evidence it could present at a hearing to cap the foreseeable number of victims of the offense at 10 to 49 [victims]. Should the Court hold a hearing, the Government could present factual information reflecting that there were over 250 victims as a result of the charged conspiracy." (Id. at 4)

With respect to Mirzoyan's role in the racketeering enterprise's money laundering activities, the Government states that,

> [i]n response to the Court's inquiry, and should the Court determine that an evidentiary hearing is necessary, the Government could present evidence from which the court could conclude that Mirzoyan held a supervisory role over money laundering activities, and/or that the money laundering activities were a core feature of the overarching fraud over which Mirzoyan was undisputedly a leader or supervisor.

(Id. at 5)

As to the means of identification enhancement, the Government states that "it is not aware of any other [legal] rationale or evidence that would support the Sentencing Agreement's stipulation that the enhancement not apply under the proper legal standard."[10] (Id. at 6)

The Government also states that the November 1, 2010 Guidelines Manual should be used to conduct the Guidelines analysis, because application of the November 1, 2016 Guidelines Manual would violate the ex post facto clause. (Id. at 7)

---

[10] The Government had argued earlier that the means of identification enhancement did not apply, because Mirzoyan had not pleaded guilty to Count Six of the Indictment, which charges access device fraud. (Jan. 13, 2017 Gov't Ltr. (Dkt. No. 902) at 6) The means of identification enhancement is not based on access device fraud, however, but instead on the conspirators' use of false driver's licenses, tax identification numbers, Social Security numbers, and other identifying information to open bank accounts and to obtain Medicare identification numbers used to obtain payment from Medicare.

In a January 26, 2017 letter, Mirzoyan states that – while not conceding that a higher Guidelines range should apply – he "is not seeking a hearing on any of the[] issues" identified by the Court, and that he "believes the record to [already] contain any and all evidence he could produce for the Court's consideration" concerning these issues. (Jan. 26, 2017 Def. Ltr. (Dkt. No. 907) at 1) As to loss amount, Mirzoyan relies on his own affirmation (Dkt. No. 847-1) and two affirmations from a Medicare billing expert (Dkt. Nos. 907-1, 907-5) in arguing that the stipulated loss amount is "both factually and legally accurate." (Jan. 26, 2017 Def. Ltr. (Dkt. No. 907) at 2-5)

The Court concluded that a hearing was necessary to develop the factual record and resolve the applicability of the various Sentencing Guidelines enhancements at issue. (See Dkt. Nos. 905, 908) The Court informed the parties that they "need not offer evidence concerning the loss amount," but that "[t]he Court wish[ed] to hear evidence concerning the remaining [Guidelines issues]" previously identified by the Court. (Dkt. No. 910)

## IV.     THE SENTENCING HEARING

The Court conducted a Fatico hearing on February 13, 2017. The Government called the case agent – Special Agent Heather Tucci of the Department of Health and Human Services' Office of the Inspector General – and Gayane Khachaturyan, a co-conspirator and cooperating witness who worked for Mirzoyan at his Glendale, California office during the racketeering conspiracy.[11] Mirzoyan did not call any witnesses or offer any evidence.

---

[11] Khachaturyan pleaded guilty to RICO conspiracy, conspiracy to commit health care fraud, and conspiracy to commit fraud in connection with identity theft. (Khachaturyan Plea Tr. (Dkt. No. 925) at 23-24)

## A. Medicare and Medicare Billing Procedures

Agent Tucci offered background testimony concerning the Medicare program, including about how doctors become a Medicare "participating provider" and obtain payment from Medicare. Medicare is a "government program that administers health care benefits for individuals over the age of 65 and [also for] some individuals who are eligible [because they] are disabled." (Hrg. Tr. (Dkt. No. 911) at 4) The purpose of Medicare is to "ensure . . . that beneficiaries receive adequate health care" and "that participating physicians are paid in a timely manner." (Id. at 5) In order to enroll in Medicare as a beneficiary, an individual must fill out an enrollment application. (Id. at 4-5) Once approved, Medicare then assigns the beneficiary a "health insurance claim number, which is essentially their Social Security number with a letter attached at the end and index that identifies other things about [the beneficiary]." (Id. at 5) Doctors use a beneficiary's health insurance claim number to bill Medicare for services provided to the beneficiary. (See id. at 8-9, 16)

A Medicare "participating provider" is a physician who "accept[s] patients that have Medicare as their insurance plan." (Id. at 5) In order to become a Medicare "participating provider," and thus obtain the right to bill Medicare for services provided, a physician must likewise go through an approval process. (Id. at 4-6) Physicians must submit an application containing personal identifying information – including the physician's name, date of birth, Social Security number, tax identification number, and National Provider Identifier ("NPI")[12] – as well as information about their medical education and license. (Id. at 6, 13-14; see also GX 1

---

[12] The National Provider Identifier is the "standard unique health identifier for health care providers and is assigned by the National Plan and Provider Enumeration System (NPPES)." (GX 5 at 3) The NPI is a unique identifier associated with a specific health care provider, and a physician only has one NPI. (Hrg. Tr. (Dkt. No. 911) at 6) A physician's NPI is public information and may be accessed in the NPPES. (Id. at 34)

at 4, 10; GX 2 at 9, 13; GX 3 at 6, 14; GX 5 at 8, 16)  Physicians also must "provide banking information for payment purposes," because Medicare pays physicians "via electronic funds transfer." (Hrg. Tr. (Dkt. No. 911) at 7)  "[P]ayments are deposited into whichever bank account [the physician] provide[s] to Medicare." (Id.)  In billing Medicare, participating providers "must use [their] NPI on all Medicare claim submissions." (See GX 3 at 2)

Once Medicare approves a physician as a participating provider, Medicare assigns the provider a "Medicare Identification Number," or "Provider Transaction Access Number ("PTAN")."  These numbers are the means by which a health care provider is identified for purposes of the Medicare system. (See Hrg. Tr. (Dkt. No. 911) at 6; GX 3 at 2; GX 5 at 3)  The PTAN serves as "the required authentication element for all inquiries to customer care representatives, written inquiry units and the Interactive Voice Response (IVR) system for inquiries concerning claims status, beneficiary eligibility and to check status or other supplier related transactions." (GX 3 at 2)  While a physician has only one NPI, he or she may "have several [Medicare Identification Numbers]" associated with different practices or offices in different states. (Hrg. Tr. (Dkt. No. 911) at 6; see also GX 6, GX 7, GX 8)

After providing health care services to a Medicare beneficiary, participating providers "submit[] bills to Medicare for payment." (Hrg. Tr. (Dkt. No. 911) at 7, 27, 30-31)  In completing a billing form, a physician must include their "provider" information and check off the relevant billing "codes" to identify "what services they billed." (Id. at 30-31)  When Medicare receives a claim for payment for a given beneficiary, the beneficiary receives an "explanation of benefits" informing the beneficiary about "what the provider billed for, . . . what was charged to Medicare[,] and . . . what Medicare paid." (Id. at 7)

**B.    Evidence Concerning the MTO's Medicare Fraud
Scheme and Money Laundering Activities**

**1.    Medicare Fraud Scheme**

Agent Tucci testified that Mirzoyan and his co-defendants operated a scheme in
which they established fraudulent clinics throughout the United States and – using the stolen
personal identifying information of physicians and patients – billed Medicare for services that
beneficiaries "never received" and "in . . . states or places where [they] had not been." (Id. at 8-
11, 16, 18, 20, 22)

The use of physicians' and Medicare beneficiaries' stolen identifying information
was an essential component of the Medicare fraud scheme. As discussed above, in order to bill
Medicare for services provided to beneficiaries, health care providers must submit an application
for approval and receive an identification number from Medicare. (Id. at 6, 13-14; see also GX 3
at 2) Following this procedure, Mirzoyan and his co-conspirators submitted fraudulent
applications using physicians' stolen personal identifying information – including their name,
date of birth, Social Security number, tax identification, and NPI – and successfully obtained
Medicare identification numbers and approval to bill Medicare. (Hrg. Tr. (Dkt. No. 911) at 6,
11-14; GX 1 at 4, 10; GX 2 at 9, 13-15; GX 3 at 2, 6, 13; GX 5 at 8, 16, 18; see also GX 6, GX 7,
GX 8 (letters from physicians denying the authenticity of applications submitted in their name to
Medicare for identification numbers, which were later used in connection with fraudulent
clinics)) Because the Medicare applications required bank account information – which
Medicare would use to pay approved providers – members of the conspiracy opened bank
accounts in the physicians' names contemporaneously with the submission of the fraudulent
Medicare applications. (Hrg. Tr. (Dkt. No. 911) at 6-7, 21-22) The accounts served as the initial
depository for payments made by Medicare on the fraudulently billed claims. (See id. at 20-21)

At the Fatico hearing, the Government offered into evidence four sample fraudulent Medicare applications that Agent Tucci had obtained during her investigation of the MTO. (Id. at 12-13; GX 1, GX 2, GX 3, GX 5) One such fraudulent application – relating to Dr. Gary D. Breslow – illustrates how members of the conspiracy used stolen physician identities to establish the fraudulent clinics.

On February 13, 2009, documents were filed with the New York Secretary of State's Office establishing a professional corporation called "Breslow Medical P.C." (GX 4 at 3) The corporate filings name Gary D. Breslow as the entity's registered agent, and provide a mailing address in Brooklyn, New York. (Id.) On March 19, 2009, a business checking account was opened at HSBC in the name of Breslow Medical P.C. and its "president," Gary D. Breslow. (Id. at 4-6) The checking account application submitted to HSBC includes a copy of a driver's license purporting to show Breslow, but which in fact contains the photograph of someone else. (Id. at 8; see also Hrg. Tr. (Dkt. No. 911) at 21-22) That same day – March 19, 2009 – an application was submitted to Medicare using Breslow's personal identifying information, including his date of birth, Social Security number, and NPI. (GX 3 at 6, 14, 19, 31-32)

On May 13, 2009, Medicare mailed a letter to Breslow – at the corporate address for Breslow Medical P.C. in Brooklyn, New York – informing him that his Medicare enrollment application was approved, that he was authorized "[t]o start billing . . . Medicare," and that his "PTAN [was] activated for use." (Id. at 2) Dr. Breslow did not authorize the opening of the bank account at HSBC, however, nor was he aware of the fraudulent clinic set up in his name. (See Hrg. Tr. (Dkt. No. 911) at 18, 22) Agent Tucci testified that investigators identified "approximately 120 [fraudulent] clinics" associated with the charged racketeering enterprise

prior to the filing of the Indictment on September 30, 2010, and an additional "70 to 90" fraudulent clinics thereafter. (Id. at 10-11)

In addition to stolen physician identifying information, Mirzoyan and his co-conspirators used stolen Medicare beneficiary identifying information to perpetrate the Medicare fraud scheme. In particular, the MTO's fraudulent clinics "billed on [Medicare beneficiaries' health insurance claim] numbers" – which are "essentially their Social Security number with a letter attached" – "for services that were not provided to them" and in "states or places where [they] had not been." (Id. at 5, 8-9, 16) According to Agent Tucci, "approximately 3,000 [Medicare beneficiaries]" – all of whom received treatment between 2005 and 2006 at Orange Regional Medical Center in Middletown, New York – had their health insurance claim numbers compromised. (Id. at 8-9) Investigators also identified "a lot more [beneficiaries' health insurance claim numbers] that ha[d] been compromised" in "approximately 25 or 26 [other] states." (Id. at 15-16)

Agents learned from surveillance and wiretapped calls that Mirzoyan used an office located at 740 East Wilson Avenue in Glendale, California as the base of operations for the Medicare fraud scheme. (Id. at 25-27) At the Fatico hearing, Gayane Khachaturyan testified that Mirzoyan contacted her in 2008 and asked whether she wanted to work as a receptionist in his office. Khachaturyan accepted the position. (Id. at 59-60) Accordingly, from 2008 until the arrest of Mirzoyan, Khachaturyan, and the other members of the racketeering enterprise in October 2010, Khachaturyan worked at Mirzoyan's office every weekday from about 8:00 a.m. to 2:00 p.m. or 3:00 p.m.. (Id. at 61-62) Mirzoyan worked at the office "most of the time," as did co-defendant Gourgen Mirimanian; other members of the racketeering enterprise – including

co-defendants Tikran Takvoyran, Jacob Pogosian, and Artur Yepiskoposyan[13] – worked

occasionally at the office or came in to speak with Mirzoyan. (Id. at 43-45, 62-66, 92, 104-07)

Other conspirators, including co-defendant Artur Manasarian,[14] would call the office with

questions about one or more of the phony clinics. (Id. at 46, 111-12)

As part of her duties and responsibilities at the office, Khachaturyan answered the

phones, checked the office's email and fax for incoming communications, completed Medicare

claims-related paperwork, deposited checks into bank accounts, picked up mail from post office

boxes, and went to the post office to send out mail. (Id. at 64-85; see also id. at 30-31)

Khachaturyan reported to Mirzoyan or to Mirimanian "if [Mirzoyan was] not in town." (Id. at

65-66) "[M]ost of the time" Mirzoyan "gave [her] instructions [on] how to handle [her] tasks."

(Id. at 65-66, 85) Mirzoyan was generally in the office every day, but when he was out of the

office, she "immediately" reported any phone calls to him, and generally "report[ed]" on all

other matters "if there [was] any news." (Id. at 66; see also GX 17 (wiretapped call in which

Khachaturyan informs Mirzoyan of telephone call about a fraudulent clinic – First Health Choice

– in which the caller "want[ed] to verify [a] tax ID [number]"; Mirzoyan tells Khachaturyan

where to find the relevant information in his desk in case the caller calls again); GX 33

(wiretapped call in which Khachaturyan provides Mirzoyan with an update concerning mail,

phone calls, and faxes received at the office))

---

[13] These defendants, along with Mirimanian, pleaded guilty to RICO conspiracy. (Mirzoyan PSR (Dkt. No. 916) ¶¶ 23, 26, 30, 33)

[14] Manasarian pleaded guilty to RICO conspiracy. (Mirzoyan PSR (Dkt. No. 916) ¶ 29) In his plea allocution, Manasarian admitted to "help[ing] [his co-conspirators] open up a business, and [engage in] fictitious billing . . . to Medicare. . . . [using the] names of patients and doctors . . . without their authorization." (Manasarian Plea Tr. (Dkt. No. 474) at 13-14)

When Mirzoyan was not at the office, Khachaturyan was responsible for answering a collection of pre-paid cell phones kept in the office. (Hrg. Tr. (Dkt. No. 911) at 66-69, 94-95; GX 10 at 112243, 112247) Mirzoyan told her how to answer these phones and what to say. (Hrg. Tr. (Dkt. No. 911) at 66-68) Each cell phone had a label taped to the back of the phone listing the name of a doctor or a phony clinic. (Id. at 29, 66-67, 94-95) Mirzoyan told Khachaturyan to pretend to be an employee of the doctor or clinic. (Id. at 66-68) When one of the cell phones rang, Khachaturyan answered, took messages, and gave the messages to Mirzoyan. (Id. at 67-68) The callers included Medicare employees, bank personnel, and "really mad" and "upset" patients calling to complain about billing. (Id. at 67) When bank employees called, they never asked for Mirzoyan. Instead, they "were looking for different people and different names. They usually asked for people [Khachaturyan] didn't know." (Id. at 73-74) She passed on to Mirzoyan all calls from banks. (Id. at 74)

Khachaturyan also collected mail twice a week from post office boxes. (Id. at 69-70) Mirzoyan gave her the keys for the post office boxes and told her where the post office boxes were located. (Id. at 69) Most of the mail Khachaturyan picked up from the post office boxes was from Medicare and banks. (Id. at 70) She gave the mail to Mirzoyan when she returned to the office. (Id.) On some occasions, Khachaturyan was not allowed to pick up the mail, because "[t]he name on the mail and the name on the P.O. box [were] different." (Id.) On these occasions, Mirzoyan would fax a copy of matching identification or fill out an application adding the name to the post office box. (Id.; see also GX 23 (wiretapped call in which Khachaturyan tells Mirzoyan that she was not permitted to pick up mail for "Norman Co."; Mirzoyan states that he will "fax a copy of [a] driver['s] license"))

Mirzoyan also used the office to prepare insurance claim forms that were sent to Medicare for payment. (Hrg. Tr. (Dkt. No. 911) at 30-31, 108-110; GX 10 at 112263) Mirzoyan gave Khachaturyan Medicare claim forms he had completed along with "a list of . . . doctors," and told her to add the doctors' names and identifying information to the insurance claim forms and then mail them. (Id. at 71-72) Khachaturyan performed this task "every day." (Id. at 71)

At Mirzoyan's direction, Khachaturyan also deposited checks into Bank of America accounts "a couple of times a week." (Id. at 72-73) The deposits were made into "different" "business account[s]" with "different names" associated with those accounts. (Id.)

Mirzoyan and his co-conspirators also maintained "memory sticks" at the office containing lists of Medicare beneficiaries' social security numbers. (Id. at 32-33, 76-78, 98-99) Mirzoyan and his co-conspirators checked these lists to determine whether any of the patients had died, "because if they were deceased, Medicare would flag that and . . . cause the clinic to be shut down." (Id. at 33, 76-77) At one point during the conspiracy, Mirzoyan directed Khachaturyan to check the lists of Social Security numbers for deceased patients, using a computer program for this purpose. (Id. at 32-33, 76-79) She maintained notebooks reflecting the results of her research, indicating with a plus sign if the beneficiary was alive and highlighting the Social Security numbers of deceased beneficiaries. (Id. at 76-78, 98-99; see also GX 10 at 112281) She performed this task "almost every day" for "a week," checking "[a]round a hundred" Medicare beneficiaries each time. (Hrg. Tr. (Dkt. No. 911) at 78-79)

On October 13, 2010 – the day of Mirzoyan's arrest – Agent Tucci and other law enforcement officers executed a search warrant at Mirzoyan's Glendale, California office. (Id. at 24-25) During the search, Tucci recovered, inter alia, Medicare billing forms; paperwork and computer files relating to the opening of fraudulent clinics "in various levels of opening through

24

the [Medicare] application process"; checkbooks and other bank documents relating to fraudulent clinics; and files containing doctors' NPI, Social Security numbers, and other personal identifying information. (Id. at 27, 30-32, 34, 37; see also GX 10 at 112286, 112292, 112298, 112304, 112310) At the <u>Fatico</u> hearing, the Government offered into evidence photographs taken inside Mirzoyan's office. These photographs show, <u>inter alia</u>, the cell phones described by Khachaturyan, health insurance claim forms, numerous express mail and post office receipts, checkbooks for the phony clinics, receipts for the rental of post office boxes, Khachaturyan's notebooks listing the Social Security numbers of Medicare beneficiaries – highlighted where the beneficiaries were deceased – and correspondence with Medicare and NPPES concerning medical providers. (<u>See</u> GX 10)

### 2. Laundering the Proceeds of the Medicare Fraud

The money laundering component of the Medicare fraud scheme began once Medicare wire-transferred payment into a fraudulent clinic's bank account. According to Agent Tucci, the MTO's money laundering activities showed the following pattern: "money [would] com[e] in [to a fraudulent clinic's bank account] from Medicare or a contractor for Medicare. And then the money would immediately . . . be taken right back out, either via check or transfer, to other bank accounts in individuals' names or other clinics that [were] later identified as fraudulent." (Hrg. Tr. (Dkt. No. 911) at 21) Tucci testified that the money was moved quickly, because there was only a "short-lived time frame" before "Medicare or a contractor would catch on and shut down the clinic." (Id.) The participants "had to get the payments in and out before law enforcement could seize the funds once the clinic was identified as fraudulent." (Id.)

The objective of the MTO's money laundering was to "move [the proceeds of the Medicare fraud] back out to other accounts . . . and ultimately try[] to get cash." (Id. at 40)

Some of the proceeds of the Medicare fraud was sent "overseas" (id. at 40; GX 13, GX 32); the conspirators also purchased "gold bars" as a "way to clean the money." (Hrg. Tr. (Dkt. No. 911) at 40-41) Agent Tucci also obtained records from Wynn Casino in Las Vegas – which Mirzoyan and his co-conspirators frequented – concerning Mirzoyan's gambling activities. (Id. at 41-42) Those records show that Mirzoyan stayed at this casino on 63 occasions between 2005 and 2010. (Id. at 42; see also id. at 83-84) He wagered $2.5 million during these visits, and lost about $700,000. (Id.)

To effectuate the money laundering scheme, Mirzoyan "utilized persons that knew how to launder the funds . . . [and] how to extract them from bank accounts," and paid these individuals for their services. (Id. at 47-48, 50; see also GX 11 at 6-8) He discussed with co-defendants which money launderers to hire and closely monitored activity in bank accounts that the MTO controlled, including "how much money was coming in" and "whether the account had been shut down yet by law enforcement or the bank." (See Hrg. Tr. (Dkt. No. 911) at 40, 43, 50; GX 11 at 6-8, 12-13)

Agent Tucci also testified about certain telephone conversations between Mirzoyan and other members of the racketeering conspiracy that were intercepted pursuant to court-authorized wiretaps. (Hrg. Tr. (Dkt. No. 911) at 37-43, 47-52) These conversations – many of which address money laundering – typically involve Mirzoyan giving "guidance" and "imparting to others how things should be done." (Id. at 43, 52) Mirzoyan's role was to "oversee the operation and ensure things were running smoothly" and to "direct certain activities," such as "the opening of bank accounts." (Id. at 52) While Mirzoyan told others "how things should be done," in none of the calls that Agent Tucci reviewed did any other co-conspirator "tell[] [Mirzoyan] what to do." (Id.)

At the <u>Fatico</u> hearing, the Government introduced a number of wiretapped telephone calls between Mirzoyan and his co-conspirators. (<u>See id.</u> at 37-43, GX 37; <u>see also</u> at GX 11, GX 13, GX 14, GX 15, GX 16, GX 22, GX 24, GX 32) Although the calls are coded, and are translated from the original Armenian, they nonetheless illustrate Mirzoyan's involvement in the racketeering enterprise's money laundering activities. For example, in a December 17, 2009 call, Mirzoyan and co-defendant Vartan Boyadzhyan[15] – who opened bank accounts on behalf of the MTO – discuss setting up a business checking account with a bank employee. (GX 22 (Call No. 6473)) The bank employee had apparently called Mirzoyan about the account and, with Boyadzhyan on another line, Mirzoyan relayed information to the bank about the nature of the account. (<u>See id.</u>) Mirzoyan told the bank that the account was expected to receive $100,000 in monthly direct deposits, and would have an average monthly balance of $20,000. (<u>Id.</u> at 3-6)

In other calls, Mirzoyan appears to exercise decision making authority with respect to the management of bank accounts and the movement of funds contained in those accounts. For example, on December 22, 2009, Mirzoyan called co-defendant Karen Simonian[16] to discuss using a "new . . . money launderer" to assist in the money laundering scheme. (GX 11 (Call No. 7007) at 6-8; Hrg. Tr. (Dkt. No. 911) at 48-51) Although Mirzoyan begins the conversation by asking Simonian whether he "[s]hould . . . give this new one to that guy – the new one," after further discussion Mirzoyan makes the decision to "give it to . . . [the new

---

[15] Boyadzhyan pleaded guilty to RICO conspiracy. (Mirzoyan PSR (Dkt. No. 916) ¶ 28) In his plea allocution, Boyadzhyan stated that, "[a]cting at the direction of others, [his] job was to take corporate papers . . . and open bank accounts in several different states under false identities . . . ." (Boyadzhyan Plea Tr. (Dkt. No. 452) at 14-15) "After [he] opened the bank accounts, [he provided] all bank papers, including checkbooks[,] . . . to the enterprise" and "knew that the[] accounts [would] be used by the fictitious clinics to receive Medicare payments." (<u>Id.</u> at 15)

[16] Simonian pleaded guilty to RICO conspiracy. (Mirzoyan PSR (Dkt. No. 916) ¶ 27)

launderer]" in order to "see how [he] work[s]." (GX 11 at 8) Mirzoyan agrees with Simonian that the new launderer should be given "[s]mall and little" amounts of money, and explains to Simonian that he "want[s] to train [the] bank" and does not want to risk moving large amounts of money and becoming "the center of attention for no reason." (Id.)

On January 14, 2010, Mirzoyan received a call from co-defendant Armen Grigorian[17] and an unidentified man. The two men tell Mirzoyan about a possible investigation into one of the MTO's bank accounts, and that the bank has called about the account. (GX 11 (Call No. 9550) at 9-11) Mirzoyan asks whether "the account [is] open or closed," and instructs Grigorian that "[i]f it is open, then let it stay open," because "[b]y the time they get to the investigation, you know it will [be] two month[s]. Let them check, so what." (Id. at 10) The unknown man then tells Mirzoyan that the account may already be closed, because the bank had been told – by the purported account holder –that there had been "fraud on his ID." (Id. at 10-11) Mirzoyan then asks whether – if the account is closed – they can "open [an account with] the same information somewhere else." (Id.) The call is then terminated after the parties express concern about discussing the details of this incident over the telephone. (Id. at 11)

On January 19, 2010, Mirzoyan spoke with co-defendant Karen Markosian,[18] whose "role . . . was to assist in laundering . . . funds" and to "move the money from . . . [the

---

[17] Grigorian pleaded guilty to conspiracy to make false bank entries. (See Superseding Information (S3) (Dkt. No. 704); Grigorian Plea Tr. (Dkt. No. 734) at 24) In his plea allocution, Grigorian alluded to this telephone call, stating that in January 2010 – at Mirzoyan's request – he introduced Mirzoyan to a friend who had a contact at Wells Fargo Bank, and that Mirzoyan and the friend agreed to present false information to Wells Fargo "in order to obtain access to . . . funds in [a] frozen [bank] account." (Grigorian Plea Tr. (Dkt. No. 734) at 19-23)

[18] Markosian pleaded guilty to conspiracy to commit money laundering. (Markosian Plea Tr. (Dkt. No. 791) at 15) During his plea allocution, Markosian stated that "participants in the health care fraud brought [him] checks that represented proceeds of the health care fraud. . . . In exchange for those checks, . . . [Markosian] [gave] them gold." Markosian understood that "a

bank accounts of] phantom clinic[s] into either [the account of] another clinic or . . . [to] extract it [as] cash." (GX 11 (Call No. 10054) at 12-13; Hrg. Tr. (Dkt. No. 911) at 47-48) The two men discuss an account from which "60 and change came out," and Markosian asks Mirzoyan "what to do with the rest." (GX 11 at 12-13) Mirzoyan agrees that the money "must go" and that "[s]omone must go in and take out cash." (Id.) Mirzoyan then questions Markosian about other accounts. Mirzoyan had expected money from Markosian that day, but Markosian told him it was "too soon" and that he did not want to be "too aggressive [in his withdrawals] to raise questions." (Id.) Markosian reports to Mirzoyan that he will "finish the 90 this week." (Id.)

On November 9, 2009, Anna Termartirosyan[19] – Mirzoyan's wife and co-defendant – called Mirzoyan about an inquiry from Citibank about a deposit made in a bank account two months earlier. (GX 15 (Call Nos. 3660) at 2; GX 16 (Call No. 3662) at 3) Citibank sought information about who made the deposit and the source of the money. (GX 15 at 2) Mirzoyan explains to Termartirosyan that the bank is "on alert" because the deposit was made in cash. (See GX 16 at 2-4) He tells Termartirosyan to maintain her story that the money came from the sale of personal jewelry, and not to present a more elaborate tale involving others to the bank. (Id. at 4-5) Mirzoyan tells Termartirosyan that he will "find out who exactly" in the MTO made the cash deposit and will pass the information along to her. (Id. at 5)

---

purpose of that transaction [was] that the participants in the health care fraud could conceal the source of the proceeds by exchanging the checks for gold." (Id. at 17)

[19] Termartirosyan pleaded guilty to structuring financial transactions to evade reporting requirements, in violation of 31 U.S.C. §§ 5323(a)(3), (d)(1). (Mirzoyan PSR (Dkt. No. 916) ¶ 37) In her plea allocution, Termartirosyan alludes to this incident, stating that "[i]n the fall of 2009, in order to evade reporting requirements, [she] provided [her] Citibank checking account number to someone in New York City who made cash deposits into [her] account [totaling] $10,000." (Termartirosyan Plea Tr. (Dkt. No. 483) at 17-18)

Other calls introduced by the Government at the Fatico hearing show Mirzoyan discussing the movement of money abroad. For example, on November 3, 2009, Mirzoyan tells co-defendant Manuk Muradakhanyan[20] that he "need[s] to send money to Yerevan" – the capital of Armenia – and the two men discuss sending "25-ish" to Armenia. (GX 13 (Call No. 3191) at 2-3) Mirzoyan tells Muradakhanyan that "[he] will have saved [Mirzoyan] big time" by assisting with the movement of the money. (Id.) On November 4, 2009 – the next day – Mirzoyan tells Termartirosyan that a package will be sent "by plane." (GX 14 (Call No. 3219))

## DISCUSSION

## I.      GUIDELINES MANUAL DETERMINATION

As a preliminary matter, this Court must determine which Guidelines Manual to apply in calculating Mirzoyan's Guidelines range.

### A.      Applicable Law

Section 1B1.11(a) of the Guidelines provides that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11(a). However, "[i]f the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(b)(1). Similarly, the Second Circuit has instructed that "when the guidelines are amended after the defendant commits a criminal offense, but before he is sentenced, and the amended provision calls for a more severe penalty than the

---

[20] Muradakhanyan pleaded guilty to RICO conspiracy. (Mirzoyan PSR (Dkt. No. 916) ¶ 31) During his plea allocution, he alluded to this episode, stating that "in November 2009, [he] received money in Los Angeles which [he] believed to be proceeds of [a] crime and on behalf of an individual . . . associated with the [MTO] enterprise. . . . [He] made the same sum of money available in Yerevan, Armenia." (Muradakhanyan Plea Tr. (Dkt. No. 470) at 10-11)

original one, those guidelines in effect at the time the offense was committed govern the imposition of sentence." United States v. Keller, 58 F.3d 884, 889 (2d Cir. 1995); see also United States v. Ortiz, 621 F.3d 82, 87 (2d Cir. 2010) (adopting a "substantial risk" standard for purposes of ex post facto clause analysis; a defendant making an ex post facto clause claim must show that the sentencing court's reliance on a post-offense increase in the Guidelines sentencing range "created a substantial risk that [the defendant's] sentence was more severe [as a result]"). The ex post facto clause is violated "when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense." Peugh v. United States, 133 S. Ct. 2072, 2078 (2013); see also Berrios v. United States, 126 F.3d 430, 433 (2d Cir. 1997) ("The relevant inquiry for ex post facto analysis is not whether a particular amendment to the Sentencing Guidelines is detrimental to a defendant, but whether application of the later version of the Sentencing Guidelines, considered as a whole, results in a more onerous penalty.").

Provisions from different Guidelines manuals cannot be mixed and matched. "The Guidelines manual in effect on a particular date shall be applied in its entirety. The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another guideline section from a different edition of the Guidelines Manual." U.S.S.G. § 1B1.11(b)(2).

**B.** **Analysis**

The Guidelines stipulations set forth in the Sentencing Agreement are based on the November 1, 2010 Guidelines Manual because – according to the parties – this manual was in effect at the time Mirzoyan's offenses were committed. (See Sentencing Agreement (Dkt. No.

31

918) at 3-4; July 14, 2014 Gov't Ltr. (Dkt. No. 827) at 4)  Moreover, the Government asserts that

use of the November 1, 2016 Guidelines Manual – the manual currently in effect – "would

violate the ex post facto clause." (Jan. 13, 2017 Gov't Ltr. (Dkt. No. 902) at 7)

      As an initial matter, the November 1, 2010 Guidelines Manual was not in effect at

the time that Mirzoyan's offenses were committed.  Accordingly, use of this manual is not

appropriate.

      "To determine the last date of the offense of conviction, a sentencing court looks

at the conduct charged in the information or indictment." United States v. Kilkenny, 493 F.3d

122, 127 (2d Cir. 2007).  Here, the charges against Mirzoyan all allege that his criminal conduct

continued "up to and including on or about the date of th[e] [I]ndictment," which was filed on

September 30, 2010.  (See Indictment (Dkt. No. 3) ¶¶ 13, 19, 28, 31, 35, 39)  The 2010

Guidelines Manual did not become effective until November 1, 2010 – after the Indictment was

filed.  Accordingly, the November 1, 2010 Guidelines Manual was not in effect at the time of

Mirzoyan's offenses and – in determining whether application of the November 1, 2016

Guidelines Manual would violate the ex post facto clause – the Court compares the applicable

Guidelines range under that manual to the result under the November 1, 2009 Guidelines manual.

      The November 1, 2016 Guidelines Manual contains an amendment post-dating

Mirzoyan's offense conduct that provides enhanced penalties for health care fraud offenses.

That amendment – which is codified as Section 2B1.1(b)(7) of the 2016 Manual – states:

> If (A) the defendant was convicted of a Federal health care offense involving a
> Government health care program; and (B) the loss under subsection (b)(1) to the
> Government health care program was (i) more than $1,000,000, increase by 2
> levels; (ii) more than $7,000,000, increase by 3 levels; or (iii) more than
> $20,000,000, increase by 4 levels.

U.S.S.G. § 2B1.1(b)(7). This amendment became effective on November 1, 2011. See U.S.S.G. App. C, vol. III, amendment 749 (Nov. 2011).

Here, Mirzoyan pleaded guilty to conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1347 and 1349. (Indictment (Dkt. No. 3) ¶¶ 25-26; Plea Tr. (Dkt. No. 920) at 10-11, 24) The 2016 Manual explains that a "Federal health care offense" has the "meaning given that term in 18 U.S.C. § 24." See U.S.S.G. § 2B1.1, comment. (n.1). Under 18 U.S.C. § 24, a "Federal health care offense" includes a "violation of, or a criminal conspiracy to violate [18 U.S.C. § 1347]." 18 U.S.C. § 24. Accordingly, Mirzoyan pleaded guilty to a "Federal health care offense." Moreover, the parties have stipulated that Mirzoyan's offense resulted in a loss to Medicare of between $20 and $50 million. Accordingly, application of Section 2B1.1(b)(7) in the 2016 Guidelines Manual would result in a four-level enhancement to Mirzoyan's Guidelines range. No such enhancement is available under the 2009 Guidelines Manual.

The 2016 Guidelines Manual contains another change that works to Mirzoyan's advantage, however. (Jan. 13, 2017 Gov't Ltr. (Dkt. No. 902) at 6-7) As a result of an amendment that became effective on November 1, 2015, the 2016 Guidelines Manual contains a flat two-level enhancement for offenses involving 10 or more victims. U.S.S.G. § 2B1.1(b)(2)(A). Accordingly, the six-level enhancement for 250 or more victims referenced in the Pimentel letter and in the PSR – and that is applicable under the 2009 Guidelines Manual – does not exist in the 2016 Guidelines Manual.

The parties have not identified, and the Court is not aware of, any other differences between the 2009 Guidelines Manual and the 2016 Guidelines Manual that would affect the calculation of Mirzoyan's Guidelines range.[21]

Having considered the differences between the 2009 and 2016 Guidelines Manuals as they apply to Mirzoyan's offenses, the Court concludes that application of the 2016 Guidelines Manual does not result in a higher Guidelines range than would be applicable were the 2009 Guidelines Manual applied. Accordingly, the ex post facto clause presents no barrier to application of the 2016 Guidelines Manual here. See Peugh, 133 S. Ct. at 2078.

As explained in more detail below, under the 2016 Guidelines Manual, Mirzoyan has a total offense level of 39. Because he falls within Criminal History Category II, under the 2016 Manual he faces a Guidelines range of 292 months' to 365 months' imprisonment. The Guidelines analysis is as follows: Under U.S.S.G § 2S1.1, the Guidelines money laundering provision, the base offense level is the offense level for the underlying offense from which the laundered funds were derived. Here, the underlying offense is fraud, and the base offense level is seven pursuant to Section 2B1.1(a)(1). Pursuant to Section 2B1.1(b)(1)(K), a twenty-level enhancement is imposed because the loss amount is more than $9.5 million but less than $25 million. A two-level enhancement is imposed pursuant to Section 2B1.1(b)(2)(A)(i), because the offense involved 10 or more victims. A four-level enhancement is imposed pursuant to Section 2B1.1(b)(7), because Mirzoyan was convicted of a federal health care offense and the loss

---

[21] The Government notes that the 2016 Guidelines Manual's loss table for fraud offenses provides that a $105 million loss amount will result in a 24-level increase, rather than the 26-level increase that would result under earlier Guidelines manuals. (See Jan. 13, 2017 Gov't Ltr. (Dkt. No. 902) at 7 (citing U.S.S.G. § 2B1.1(b)(1)(N))) As explained below, however, the Court will accept the parties' stipulated loss amount of $20 million to $50 million – and will apply the twenty-level enhancement that corresponds to a $9.5 million to $25 million loss. Accordingly, the amendment addressing greater loss amounts does not benefit Mirzoyan.

amount is more than $20 million. A two-level enhancement is imposed for sophisticated means, pursuant to Section 2B1.1(b)(10)(C). A further two-level enhancement is imposed because the offense involved the unauthorized use of a means of identification unlawfully to produce or obtain another means of identification, pursuant to Section 2B1.1(b)(11)(C)(i). A further two-level enhancement is appropriate under Section 2S1.1(b)(2)(B), because Mirzoyan was convicted under 18 U.S.C. § 1956. Finally, Mirzoyan receives a three-level role in the offense enhancement pursuant to Section 3B1.1(b), because he was a manager or supervisor of the money laundering scheme, which involved five or more participants. Mirzoyan's adjusted offense level under the money laundering guidelines is reduced by three levels for acceptance of responsibility, resulting in a total offense level of 39.

Under the 2009 Guidelines Manual, Mirzoyan has a higher total offense level and would face a longer Guidelines range. Under U.S.S.G § 2S1.1, the base offense level is the offense level for the underlying offense from which the laundered funds were derived. Accordingly, the base offense level for fraud under Section 2B1.1(a)(1) applies, resulting in a base offense level of seven. Mirzoyan would receive a twenty-two level enhancement under Section 2B1.1(b)(1)(L), because the loss amount is more than $20 million but less than $50 million. Mirzoyan would also receive a six-level enhancement under Section 2B1.1(b)(2)(C), because his offenses involve 250 or more victims. A two-level enhancement for sophisticated means would apply under Section 2B1.1(b)(9)(C), and a further two-level enhancement would apply under Section 2B1.1(b)(10)(C)(i) because Mirzoyan's offenses involve the unauthorized use of a means of identification unlawfully to produce or obtain another means of identification. Mirzoyan would also receive a two-level enhancement under Section 2S1.1(b)(2)(B), because he was convicted under 18 U.S.C. § 1956, and a three-level role in the offense enhancement under

Section 3B1.1(b), because he was a manager or supervisor of the money laundering scheme, which involved five or more participants. Mirzoyan would receive a three-level reduction for acceptance of responsibility, resulting in a total offense level of 41. For defendants in Criminal History Category II, offense level 41 results in a Guidelines range of 360 months' to life imprisonment.

Because application of the 2016 Guidelines Manual results in a lower Guidelines range than that applicable under the 2009 Guidelines Manual, use of the 2016 Guidelines Manual presents no ex post facto clause violation. Accordingly, the 2016 Guidelines Manual will be applied in calculating Mirzoyan's Guidelines range.

## II.    **LOSS AMOUNT**

In the Sentencing Agreement, the parties stipulated to a loss amount of between $20 million and $50 million, resulting in a twenty-two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(L) in the November 2010 Guidelines Manual. (Sentencing Agreement (Dkt. No. 918) at 3) As discussed above, the Government's Pimentel letter and the PSR use a loss amount of between $100 million and $200 million, resulting in a twenty-six level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(N) in the November 2010 and November 2012 Guideline Manuals. (See May 1, 2012 Gov't Ltr. (Dkt. No. 917) at 3; Mirzoyan PSR (Dkt. No. 916) ¶ 112)

While the Government maintains – and Mirzoyan does not dispute – that the total amount billed to Medicare was in excess of $100 million (see July 14, 2014 Gov't Ltr. (Dkt. No. 827) at 1; Oct. 20, 2013 Def. Ltr. (Dkt. No. 847) at 4; Jan. 13, 2017 (Dkt. No. 902) at 3), the parties argue that the stipulated loss amount of between $20 million to $50 million is

appropriate,[22] because within this range is the amount that Mirzoyan subjectively expected to receive from Medicare, based on his understanding of Medicare's fee schedules and reimbursement procedures. (See July 14, 2014 Gov't Ltr. (Dkt. No. 827) at 1-2; Oct. 20, 2014 Def. Ltr. (Dkt. No. 847) at 2-16; Jan. 13, 2017 Gov't Ltr. (Dkt. No. 902) at 3-4; Jan. 26, 2017 Def. Ltr. (Dkt. No. 907) at 2-5) Mirzoyan contends that "he did not expect to be paid the amounts billed to Medicare," and in fact "expected to be paid significantly less." (Oct. 20, 2014 Def. Ltr. (Dkt. No. 847) at 3) In support of this argument, Mirzoyan has submitted an affirmation setting forth his understanding of the Medicare billing process, along with affirmations from an expert in the Medicare billing process. (See Oct. 8, 2014 Mirzoyan Aff. (Dkt. No. 847-1); Oct. 27, 2014 Blount Aff. (Dkt. No. 907-1); Jan. 27, 2017 Blount Aff. (Dkt. No. 907-5))

### A.  **Applicable Law**

"Loss" for purposes of U.S.S.G. § 2B1.1(b)(1) "is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, comment. (n.3(A)). "In a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted." U.S.S.G. § 2B1.1, comment. (n.3(F)(viii)). The Guidelines provide that "'[i]ntended loss' . . . includes intended

---

[22] The 2016 Guidelines Manual does not contain a loss range of $20 million to $50 million. As a result of an amendment that went into effect on November 1, 2015, the loss range closest to what the parties negotiated is $25 million to $65 million. See U.S.S.G. § 2B1.1(b)(1)(L). As stated above, and as explained further below, the Court intends to apply a twenty-level enhancement for loss, which corresponds to a loss of between $9.5 million and $25 million. See U.S.S.G. § 2B1.1(b)(1)(K).

pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." U.S.S.G. § 2B1.1, comment. (n.3(A)(ii)).

A defendant can rebut prima facie evidence of "intended loss" by showing that he did not, in fact, intend losses in the amount billed. In United States v. Singh, 390 F.3d 168 (2d Cir. 2004) – a case involving fraudulent Medicare claims – the defendant argued "that he never intended or expected to receive the full amounts billed because all the programs capped the amount of payment for each service performed." Singh, 390 F.3d at 193. Singh claimed, therefore, that "the intended loss should [be] computed on the basis of the amounts actually paid by the insurance companies, rather than on the basis of the billings," given that "the insurance companies routinely paid less than they were billed for the services." Id. The district court rejected Singh's argument, and determined the loss amount based on the amount of Singh's billings. Id. at 191, 193-94.

The Second Circuit remanded the case for further proceedings as to intended loss. Id. at 194. The Second Circuit instructed that, on remand, the defendant "should have a[n] . . . opportunity . . . to show, if he can, that the total amount he expected to receive from the insurers was . . . less than the amounts he actually billed." Id. In reaching this conclusion, the Second Circuit emphasized that Singh – a physician – "was intimately familiar with the billing procedures of the Practice[,]" and that it therefore did "not require a leap of logic to infer that he knew full well that he would not be entirely reimbursed on his billing claims." Id. at 193; see id. ("Indeed, '[i]t is common knowledge that Medicare and private insurers pay fixed rates for medical procedures.'" (quoting United States v. Nachamie, 121 F. Supp. 2d 285, 293 n.6 (S.D.N.Y. 2000))).

**B.    Analysis**

Here, as this Court has previously noted, the presumptive "'intended loss' is readily calculable, because records exist of the billings submitted by the MTO's fraudulent clinics to Medicare, and 'intended loss' can be derived from these billing records. Given that Medicare rejected many bills from MTO-related clinics after determining their fraudulent nature, it is obvious that 'intended loss' is larger than the 'actual loss' for Guidelines purposes." (June 11, 2014 Order (Dkt. No. 804) at 9) As noted above, where, as here, a defendant has pled guilty to a federal health care offense, "the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss." U.S.S.G. § 2B1.1, comment. (n.3(F)(viii)).

Based on Singh, however, this Court must consider whether Mirzoyan has rebutted the prima facie evidence of "intended loss" through evidence demonstrating that "he expected to receive . . . less [from Medicare] than the amounts he actually billed." See Singh, 390 F.3d at 193-94. Mirzoyan argues that, because of his familiarity with Medicare billing and reimbursement practices, "he did not expect to be paid the amounts billed to Medicare," and in fact "expected to be paid significantly less." (Oct. 20, 2014 Def. Ltr. (Dkt. No. 847) at 3, 8)

In an October 8, 2014 affirmation, Mirzoyan describes his background in and knowledge of Medicare billing and reimbursement practices. (Oct. 8, 2014 Mirzoyan Aff. (Dkt. No. 847-1)) In 2002 to 2003 – before his involvement in the charged offenses – Mirzoyan was employed at a clinic as a sleep disorder technician. (Id. ¶ 4) In that position, Mirzoyan received training concerning Medicare "billing codes, billing, pricing and reimbursement." (Id. ¶¶ 6, 7(a)) Mirzoyan was taught that "Medicare approved payment according to a fee schedule," which set forth "the maximum payment . . . allow[ed]" for services and procedures. (Id. ¶ 7(b))

Mirzoyan also learned that Medicare "[p]ayment was not only capped by the amount allowed within the Medicare fee schedule[,] but [Medicare] also only paid 80 percent of the amount allowed, with [a 20 percent] copayment to be paid by the patient." (Id. ¶ 7(c))

In late 2003, after establishing his own medical diagnostic testing business, Mirzoyan became a Medicare-approved participating provider. (Id. ¶¶ 9-11) Mirzoyan received a "welcome kit" containing information about Medicare billing, and passed a "site inspection" during which a Medicare representative ensured that he "was aware of and up to speed with Medicare billing and reimbursement." (Id. ¶¶ 11-12) Mirzoyan received additional training in Medicare billing and reimbursement practices from the company that provided the equipment for his business. (Id. ¶ 13) Mirzoyan also managed his own Medicare billing using "Med Office" billing software, and he received additional instruction concerning Medicare billing and reimbursement practices in connection with learning how to use the "Med Office" software. (Id. ¶¶ 15-16) Mirzoyan sold his diagnostic testing business in 2004 and became involved in the charged Medicare fraud scheme, but – because of his prior experience – he

> never intended or expected to be paid the billed amount or the amount allowed for any of the phantom clinics. [He] was aware, through previous employment[,] that Medicare paid for procedures according to a fee schedule, regardless of the amount billed. [He] also knew that of the amount allowed, only 80 percent would be paid because the remaining 20 percent is supposed to be covered by the patient. However, because the patient did not actually receive treatment [from his phantom clinics], no copayment would be forthcoming.

(Id. ¶¶ 28, 38) Mirzoyan adds that he "expected to be paid even less [than 80 percent of the amount Medicare allowed] because there was a high likelihood that Medicare would . . . deny claims or claw back money or that banks would freeze money in the accounts."[23] (Id. ¶ 39)

---

[23] The Government states that – other than Mirzoyan's affirmation – it is "not aware of any evidence that speaks directly to Mirzoyan's subjective intentions and familiarity with regard to Medicare fee schedules." (Jan. 13, 2017 Gov't Ltr. (Dkt. No. 902) at 3)

Mirzoyan's discussion of Medicare fee schedules and reimbursement rates is supported by affirmations from Lamar Blount, an expert in Medicare billing and reimbursement. (See Oct. 27, 2014 Blount Aff. (Dkt. No. 907-1); Jan. 27, 2017 Blount Aff. (Dkt. No. 907-5)) Blount explains that participating providers in the Medicare system are subject to a "fee schedule," which "establish[es] the maximum that a provider will be reimbursed for the service rendered [to a Medicare beneficiary], regardless of the dollar amount actually billed to Medicare." (Oct. 27, 2014 Blount Aff. (Dkt. No. 907-1) ¶ 14(a)) Moreover – of the maximum amount set forth in Medicare's fee schedule – Medicare "pays 80 percent[,] . . . with the remaining 20 percent payable by the patient [to the physician] as coinsurance." (Id. ¶ 14(b)) According to Blount, "[p]roviders are aware of the Medicare fee schedule and coinsurance requirements because . . . they are . . . supplied with a package . . . explain[ing] Medicare billing and provid[ing] a fee schedule for billing" at the time they receive approval to participate in the Medicare program. (Id. ¶ 16) Blount further states that, in the context of phony clinics such as those created by Mirzoyan, "the same principles . . . apply," except that "the provider would not collect the 20 percent coinsurance because the patient is not aware of the testing, is not the recipient of any testing, and is obviously not present to make the 20 percent coinsurance [payment]." (Id. ¶ 19) Blount also states that, based on his experience working with health care providers, "even if . . . Mirzoyan was not aware of the reimbursement rate when he originally billed a claim, he most likely would learn after the first month of billing[,] because Medicare issues detailed Remittance Advices for each payment to the provider with that information explained for each item or service billed." (Jan. 27, 2017 Blount Aff. (Dkt. No. 907-5) ¶ 22(e))

As with the defendant in Singh, it appears that Mirzoyan "was intimately familiar with the billing procedures" of Medicare. See Singh, 390 F.3d at 193. "It does not require a leap

41

of logic to infer that he knew full well that he would not be entirely reimbursed on his billing claims." Id. What remains to determine is the portion of the more than $100 million billed to Medicare that it would have been subjectively reasonable for Mirzoyan to think that he might recover.

Analysis of this issue is made difficult by the parties' failure to provide information concerning the maximum payment that Medicare's fee schedules would have allowed on the fraudulent claims submitted by Mirzoyan and his co-conspirators. Even if fee schedules had been provided and this Court was in a position to calculate the maximum amount that Medicare would have approved on the MTO's fraudulent claims, the evidence before the Court indicates that Medicare often detected the fraudulent nature of the MTO's phantom clinics within several months or less of their creation, and then disapproved any further claims from those clinics, and sought to freeze and clawback any funds remaining in the clinics' bank accounts. (See Hrg. Tr. (Dkt. No. 911) at 21; Oct. 8, 2014 Mirzoyan Aff. (Dkt. No. 847-1) ¶ 39; see also Oct. 27, 2014 Blount Aff. (Dkt. No. 907-1) ¶¶ 37-92 (comparing billing chart with clinics' bank records and citing instances of Medicare stopping or recovering payment)) Because of Medicare's fee schedules, the pace at which it detected the fraudulent nature of the MTO's clinics, and the actions that Medicare took once it detected fraud, the Court concludes that it would have been subjectively reasonable for Mirzoyan to believe that he would receive far less than the $100 million that the MTO billed to Medicare.

The Government has provided multiple analyses that reach different conclusions as to the amounts Medicare paid out on fraudulent claims submitted by MTO-affiliated clinics. The estimates range from $32.6 million, to $35.7 million, to $39.2 million, to $45.3 million. (July 9, 2013 Gov't Ltr. (Dkt. No. 701) at 5-9; July 14, 2014 Gov't Ltr. (Dkt. No. 827) at 1-2;

Dec. 2, 2014 Gov't Ltr. (Dkt. No. 856) at 3; Jan. 13, 2017 Gov't Ltr. (Dkt. No. 902) at 3-4)

Mirzoyan argues that the various analyses submitted by the Government "are not reliable for a determination of loss" (see Oct. 27, 2014 Blount Aff. (Dkt. No. 907-1) ¶¶ 27-96), but he has not provided any competing analysis or calculations to the Court. Instead, Mirzoyan merely states that the stipulated loss amount of $20 million to $50 million is "both factually and legally accurate." (Jan. 26, 2017 Def. Ltr. (Dkt. No. 907) at 4-5)

The Court concludes that given (1) the proof regarding Mirzoyan's knowledge of Medicare's reimbursement policies; (2) the action taken by Medicare once the fraudulent nature of the MTO's clinics was detected; and (3) the fact that all of the Government's estimates of actual loss fall within the stipulated range of $20 million to $50 million, the parties' stipulated loss range of $20 million to $50 million is not unreasonable. Because the 2016 Guidelines Manual does not contain a range of $20 million to $50 million in its loss table – and instead provides for a range of $25 million to $60 million – the Court will apply the next lowest loss range: $9.5 million to $25 million. Application of that loss range results in a twenty-level enhancement under U.S.S.G. § 2B1.1(b)(1)(K).

## III.   ENHANCEMENT FOR NUMBER OF VICTIMS

With respect to an enhancement based on the number of victims, the Sentencing Agreement differs drastically from prior Guidelines calculations provided to the Court. Both the Government's Pimentel letter and the PSR apply a six-level enhancement to Mirzoyan's base offense level pursuant to U.S.S.G. § 2B1.1(b)(2)(C) in the November 2010 and November 2012 Guidelines Manuals, because Mirzoyan's offenses involve more than 250 victims of identity theft. (May 1, 2012 Gov't Ltr. (Dkt. No. 917) at 3; Mirzoyan PSR (Dkt. No. 916) ¶ 113) The Sentencing Agreement provides for only a two-level enhancement, stating that Mirzoyan's

offenses involve between ten and forty-nine victims. (Sentencing Agreement (Dkt. No. 918) at 3)

A.   **Applicable Law**

Under the 2016 Guidelines Manual, Section 2B1.1(b)(2) provides for a two-level enhancement if the offense "involved 10 or more victims." U.S.S.G. § 2B1.1(b)(2)(A)(i). There is no six-level enhancement for offenses involving 250 or more victims. See U.S.S.G. App. C, vol. III, amendment 792 (Nov. 2016).

In cases involving stolen means of identification, "victim" means "any individual whose means of identification was used unlawfully or without authority." U.S.S.G. § 2B1.1, comment. (n.4(E)). A "means of identification" "has the meaning given that term in 18 U.S.C. § 1028(d)(7), except that such means of identification shall be of an actual (i.e., not fictitious) individual, other than the defendant or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct)." U.S.S.G. § 2B1.1, comment. (n.1). Under 18 U.S.C. § 1028(d)(7), a "means of identification" is defined as

any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any –

(A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;

(B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;

(C) unique electronic identification number, address, or routing code; or

(D) telecommunication identifying information or access device (as defined in section 1029(e));

18 U.S.C. § 1028(d)(7). In this case, each of the hundreds of doctors and thousands of patients whose identifying information was stolen and then used to submit fraudulent claims to Medicare is a "victim" for purposes of the Sentencing Guidelines.

### B.    Analysis

The Court concludes that a two-level enhancement pursuant to Section 2B1.1(b)(2) of the 2016 Guidelines Manual is appropriate here, because the record supports – and the parties do not dispute – that the offense conduct "involved 10 or more victims." U.S.S.G. § 2B1.1(b)(2)(A)(i). Indeed, in their Sentencing Agreement, the parties stipulate to a two-level enhancement under the 2010 Guidelines Manual and agree that Mirzoyan's offenses involve between ten and forty-nine victims. (See Sentencing Agreement (Dkt. No. 918) at 3; see also July 14, 2014 Gov't Ltr. (Dkt. No. 827) at 2-3; Jan. 13, 2017 Gov't Ltr. (Dkt. No. 902) at 4) Although the victim enhancement provision has been modified in the 2016 Guidelines Manual, see U.S.S.G. App. C, vol. III, amendment 792 (Nov. 2016), the amendment does not affect the parties' agreed-upon, two-level enhancement for ten or more victims.

The evidence presented at the Fatico hearing demonstrates that the Medicare fraud scheme involved more than ten victims, whose means of identification were used unlawfully and without authority. See U.S.S.G. § 2B1.1, comment. (n.4(E)). Indeed, with respect to beneficiaries alone, Agent Tucci testified that investigators had "identified approximately 3,000 [Medicare beneficiaries]" – all of whom had received treatment at one point from Orange Regional Medical Center in Middletown, New York – whose health insurance claim numbers were stolen and used in the MTO's Medicare fraud scheme. (Hrg. Tr. (Dkt. No. 911) at 8-9, 15-16)

As Agent Tucci explained, a Medicare beneficiary's "health insurance claim

number . . . is essentially their Social Security number with a letter attached at the end and index

that identifies other things about [the beneficiary]." (Id. at 5, 17) Mirzoyan and his co-

conspirators used these health insurance claim numbers to fraudulently bill Medicare "for

services [the beneficiaries] never received" and in "state[s] in which they [did not] reside[]." (Id.

at 9, 16) In addition to the 3,000 beneficiaries associated with the Orange Regional Medical

Center whose identifying information was compromised, investigators identified "a lot more

names [of beneficiaries] that ha[d] been compromised" in "approximately 25 or 26 [other]

states." (Id. at 15-16)

Agent Tucci further testified that when a search warrant was executed at

Mirzoyan's office in Glendale, California on October 13, 2010, investigators discovered, inter

alia, notebooks containing "Social Security numbers associated with beneficiaries." (Id. at 24-

25, 32-33) Mirzoyan and his co-conspirators kept track of whether the Medicare beneficiaries

whose identifying information they had stolen were still alive, "because if they were deceased,

[using those beneficiaries' identifying information for billing purposes would cause] Medicare

. . . [to] flag that [billing] and it could cause the clinic to be shut down." (Id. at 33) Gayane

Khachaturyan, the Government's cooperating witness, testified that she maintained the

notebooks and "highlight[ed]" a Social Security number "[i]f the patient [had] died." (Id. at 76-

78) She further testified that Mirzoyan directed her to perform these checks "almost every day"

for "a week," and that she checked "[a]round a hundred" Social Security numbers for Medicare

beneficiaries each time. (Id. at 78-79) Photographs of Khachaturyan's notebooks introduced

into evidence at the Fatico hearing show sequentially numbered lists of Medicare beneficiaries'

Social Security numbers, with some of the Social Security numbers highlighted in yellow. (See id. at 32, 98; see also GX 10 at 112281)

There is overwhelming evidence here that Mirzoyan's offenses involve ten or more victims of identity theft. Accordingly, the Court will apply the two-level enhancement set forth in U.S.S.G. § 2B1.1(b)(2)(A)(i) in calculating Mirzoyan's Guidelines range.

## IV.   FEDERAL HEALTH CARE OFFENSE ENHANCEMENT

Under the 2016 Guidelines Manual, the Court must also consider whether Mirzoyan qualifies for an enhancement based on his commission of a federal health care offense. Although the Government has argued that application of this enhancement would constitute an ex post facto violation (see July 14, 2014 Gov't Ltr. (Dkt. No. 827) at 4; Jan. 13, 2017 Gov't Ltr. (Dkt. No. 902) at 7), as discussed above, the Court concludes that application of the 2016 Guidelines Manual – including this provision – does not present such a violation, because application of the 2016 Guidelines results in a lower sentencing range than that applicable under the 2009 Guidelines Manual.

Section 2B1.1(b)(7) of the 2016 Guidelines Manual provides that:

[i]f (A) the defendant was convicted of a Federal health care offense involving a Government health care program; and (B) the loss under subsection (b)(1) to the Government health care program was (i) more than $1,000,000, increase by 2 levels; (ii) more than $7,000,000, increase by 3 levels; or (iii) more than $20,000,000, increase by 4 levels.

U.S.S.G. § 2B1.1(b)(7).

A "Federal health care offense" – as referenced in the 2016 Guidelines Manual – includes "a violation of, or a criminal conspiracy to violate section 669, 1035, 1347, or 1518 of . . . title [18]." See 18 U.S.C. § 24(a)(1); see also U.S.S.G. § 2B1.1, comment. (n.1). Here, Mirzoyan pleaded guilty to conspiracy to commit health care fraud in violation of 18 U.S.C. §§

1347 and 1349. (Indictment (Dkt. No. 3) ¶¶ 25-26) Accordingly, Mirzoyan committed a qualifying "Federal health care offense," as that term is defined in the Guidelines. Moreover, as discussed above, the parties have stipulated that Mirzoyan's offense resulted in a loss amount of between $20 million and $50 million. Accordingly, the Court concludes that a four-level enhancement for the commission of a federal health care offense is appropriate.

## V.   MEANS OF IDENTIFICATION ENHANCEMENT

The Government's Pimentel letter and the PSR apply a two-level enhancement for using a means of identification unlawfully to obtain another means of identification, pursuant to Section 2B1.1(b)(2)(10) of the November 2010 and November 2012 Guidelines Manuals. (May 1, 2012 Gov't Ltr. (Dkt. No. 917) at 4; Mirzoyan PSR (Dkt. No. 916) ¶ 115) The Sentencing Agreement contains no such enhancement (see Dkt. No. 918), and the Government argued at one time that "[a]lthough[,] to be sure[,] identities were stolen as part of [the] fraud scheme[,] those stolen means of identification were not used to produce or obtain other means of identification." (July 14, 2014 Gov't Ltr. (Dkt. No. 827) at 3) The Government has since conceded that "it is not aware of any . . . rationale or evidence that would support the Sentencing Agreement's stipulation that the enhancement not apply under the proper legal standard." (Jan. 13, 2017 Gov't Ltr. (Dkt. No. 902) at 6)

### A.   Applicable Law

Section 2B1.1(b)(11) of the 2016 Guidelines Manual provides that

[i]f the offense involved . . . (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, increase by 2 levels.

U.S.S.G § 2B1.1(b)(11).

As explained above, a "means of identification" "has the meaning given that term in 18 U.S.C. § 1028(d)(7)." U.S.S.G. § 2B1.1, comment. (n.1). Under 18 U.S.C. § 1028(d)(7), a "means of identification" is defined as

> any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any –
>
>> (A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;
>>
>> (B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;
>>
>> (C) unique electronic identification number, address, or routing code; or
>>
>> (D) telecommunication identifying information or access device (as defined in section 1029(e));

18 U.S.C. § 1028(d)(7).

The commentary to Section 2B1.1 explains that "[s]ubsection (b)(11)(C)(i) applies in a case in which a means of identification of an individual other than the defendant (or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct)) is used without that individual's authorization unlawfully to produce or obtain another means of identification." U.S.S.G. § 2B1.1, comment. (n.9(C)(i)). The commentary provides the following examples of conduct that falls within subsection (b)(11)(C)(i):

> (I)    A defendant obtains an individual's name and social security number from a source (e.g., from a piece of mail taken from the individual's mailbox) and obtains a bank loan in that individual's name. In this example, the account number of the bank loan is the other means of identification that has been obtained unlawfully.
>
> (II)    A defendant obtains an individual's name and address from a source (e.g., from a driver's license in a stolen wallet) and applies for, obtains, and subsequently uses a credit card in that individual's name. In this example, the credit card is the other means of identification that has been obtained unlawfully.

49

U.S.S.G. § 2B1.1, comment. (n.10(C)(ii)).

Moreover, Mirzoyan need not have personally stolen victims' identities and used them to obtain another means of identification. It is sufficient if co-conspirators engaged in that conduct in furtherance of the racketeering enterprise, and their conduct was reasonably foreseeable to Mirzoyan. See U.S.S.G. § 1B1.3(a)(1)(B).

**B.    Analysis**

Here, there is overwhelming evidence that Mirzoyan and his co-conspirators obtained "means of identification" in the form of physicians' and Medicare beneficiaries' stolen identifying information. The only remaining issue is whether that information was used to produce or obtain any other means of identification, and whether that was known by Mirzoyan or foreseeable to him. Evidence before the Court demonstrates that this enhancement is properly applied on two different theories.

First, Mirzoyan and his co-conspirators used physicians' stolen identifying information to apply to Medicare for approval as "participating providers" and, upon obtaining approval for their phony clinics, received additional identification numbers from Medicare. Agent Tucci testified that, during the investigation into the MTO, she obtained copies of fraudulent applications submitted to Medicare by members of the conspiracy. (Hrg. Tr. (Dkt. No. 911) at 11-12) These applications – examples of which were introduced at the Fatico hearing – contain physicians' stolen identifying information, including their name, date of birth, Social Security number, tax identification number, NPI, and information about their medical education and license. (Id. at 6, 13-14; see also GX 1 at 4, 10; GX 2 at 9, 13-15; GX 3 at 6, 13; GX 5 at 8, 16, 18) As Agent Tucci explained, once Medicare approves a physician's application to participate in the Medicare system as a participating provider, Medicare assigns the provider

with a Medicare identification number – also referred to as a Provider Transaction Access Number (PTAN) – which is a means for identifying a Medicare supplier. (Hrg. Tr. (Dkt. No. 911) at 6; GX 3 at 2; GX 5 at 3) The PTAN serves as "the required authentication element for all inquiries to customer care representatives, written inquiry units and the Interactive Voice Response (IVR) system for inquiries concerning claims status, beneficiary eligibility and to check status or other supplier related transactions." (GX 3 at 2)

Accordingly, obtaining a PTAN was a necessary step in establishing a phony clinic for the purpose of fraudulently billing Medicare. As Tucci testified, Mirzoyan and his co-conspirators submitted provider applications using physicians' stolen identities in order to obtain approval to bill Medicare, and the search warrant executed at Mirzoyan's Glendale, California office revealed, inter alia, "fraudulent clinic paperwork, including Medicare applications, . . . [that] seemed to be in various levels of opening through the application process." (See Hrg. Tr. (Dkt. No. 911) at 6, 11-12, 30)

At the Fatico hearing, the Government introduced into evidence sample fraudulent Medicare applications, including one application submitted in the name of Dr. Gary D. Breslow – whose identity had been stolen as part of the scheme – for a phony clinic, Breslow Medical PC. (GX 3; GX 4; Hrg. Tr. (Dkt. No. 911) at 11-12, 20-22) The Government also introduced an approval letter from Medicare, which assigned Breslow Medical PC a PTAN that had been "activated for use." (GX 3 at 2) The physicians whose identities were used in submitting these fraudulent applications, including Dr. Breslow, "denied any knowledge of [the clinics], and . . . denied having opened the clinics or having submitted applications to Medicare for those clinics." (See Hrg. Tr. (Dkt. No. 911) at 18, 21-22; see also GX 6 (letter from Dr. David Agus stating he had "no association" with a phony clinic and did not "recently submit[]

[an application for] a Medicare PIN for a practice in New York"); GX 7 (letter from Dr. Susan Logan stating she "did not authorize anyone to use [her] personal information to obtain a Medicare number for [a phony clinic] and . . . did not sign a Medicare application for th[e] organization"); GX 8 (letter from Dr. Brian Gwartz stating he did "not recently appl[y] for a new Medicare number in Texas" and has no practice in that state))

The Court concludes that the two-level means of identification enhancement is properly imposed pursuant to Section 2B1.1(b)(11), because Mirzoyan and his co-conspirators used doctors' stolen identifying information to obtain Medicare identification numbers.

Stolen physicians' identities were also used to open bank accounts on behalf of the phony clinics. These accounts were necessary to receive the payments from Medicare. As Agent Tucci testified, approved providers are paid by Medicare "via electronic funds transfer," and Medicare "payments are deposited into whichever bank account [the provider] provide[s] to Medicare." (Hrg. Tr. (Dkt. No. 911) at 7) Opening a bank account requires "[p]ersonal identifying information, such as [a] Social Security number, names, date of birth[,] [and] some supporting documents, like [a] driver's license." (Id. at 20)

As part of the Medicare fraud scheme, Mirzoyan and his co-conspirators opened bank accounts using the identifying information of physicians with whom the clinics were purportedly connected. For example, the MTO used Dr. Breslow's identifying information – and a fake driver's license containing a photo depicting someone other than Dr. Breslow – to open a bank account with HSBC for purposes of receiving payments from Medicare. (Id. at 21-22; GX 3 at 34-37; GX 4 at 1-2, 3-7) The bank account was opened on March 19, 2009, the same day that an application to become a Medicare participating provider was submitted in Dr. Breslow's name. (See GX 4 at 32, 37; GX 4 at 1) Dr. Breslow later told investigators that he did not

authorize the opening of that bank account with his identifying information. (Hrg. Tr. (Dkt. No. 911) at 22)

As discussed in the commentary to Section 2B1.1(b)(11), an enhancement is appropriate where a defendant "obtains an individual's name and social security number from a source (e.g., from a piece of mail taken from the individual's mailbox) and obtains a bank loan in that individual's name." U.S.S.G. § 2B1.1, comment. (n.10(C)(ii)). If an account number corresponding to a bank loan constitutes a "means of identification," see id., then a bank account – along with its corresponding account number and routing number – also qualifies as a means of identification. See 18 U.S.C. § 1028(d)(7)(C) (defining a "means of identification" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any . . . unique electronic identification number, address, or routing code").

Accordingly, in calculating Mirzoyan's Guidelines range, the Court will apply a two-level enhancement for using a means of identification unlawfully to obtain another means of identification, pursuant to Section 2B1.1(b)(2)(11).

## VI.   APPLICABILITY OF GUIDELINES MONEY LAUNDERING PROVISION

The Sentencing Agreement also departs from the PSR by calculating the total offense level using the Guidelines provisions applicable to fraud, rather than the Guidelines provisions applicable to money laundering. (See Sentencing Agreement (Dkt. No. 918) at 3-4) As explained below, because the Court must use the Guidelines provisions that yield the highest offense level, the Guidelines provisions applicable to money laundering will be used in calculating Mirzoyan's Guidelines range.

**A.    The Parties' Rejection of the Guidelines Money Laundering Provisions**

Section 3D1.2 of the 2016 Guidelines Manual provides that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." U.S.S.G. § 3D1.2. Under the Guidelines grouping rules, Counts One, Two, Three, and Five are grouped together, because the offense level for those counts is based on the total amount of loss. U.S.S.G. § 3D1.2(d). Count Four is also grouped with those counts, however, because the money laundering offense Mirzoyan pleaded guilty to is related to the funds derived from the fraud offenses that are the subject of Counts One, Two, Three and Five. See U.S.S.G. § 2S1.1, comment. (n.6); § 3D1.2(c). Pursuant to Section 3D1.3(a), the offense level applicable to any group of offenses is "the offense level . . . for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group." U.S.S.G. § 3D1.3(a).

Here, the parties contend that the Sentencing Agreement's failure to apply the Guidelines money laundering provisions is proper, because application of the money laundering provisions allegedly results in a lower range than application of the Guidelines fraud provisions. (See July 14, 2014 Gov't Ltr. (Dkt. No. 827) at 2; Oct. 20, 2014 Def. Ltr. (Dkt. No. 847) at 21; Jan. 13, 2017 Gov't Ltr. (Dkt. No. 902) at 4 n.5) However, the parties achieved this outcome only by agreeing that Mirzoyan would not receive any aggravating role enhancement in connection with his money laundering activities. (See id.) As discussed below, this Court cannot adopt this aspect of the parties' Sentencing Agreement, because Mirzoyan qualifies for an aggravating role enhancement based on the money laundering-related conduct he engaged in while perpetrating the Medicare fraud scheme. Once a role enhancement is imposed, the Guidelines money laundering provisions must be applied, because they yield a higher offense level than the Guidelines fraud provisions.

The Sentencing Guidelines provide for two different aggravating role enhancements. Section 3B1.1(a) imposes a four-level enhancement where "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Section 3B1.1(b) imposes a three-level enhancement where the defendant was a "manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). In determining whether an aggravating role enhancement is appropriate for the money laundering activities Mirzoyan engaged in, this Court considers only "the offense covered by [that] guideline (i.e., the laundering of criminally derived funds) and not . . . the underlying offense from which the laundered funds were derived." U.S.S.G. § 2S1.1, comment. (n.2(C)).

As noted above, the parties contend that the Guidelines fraud provisions yield a higher offense level than the Guidelines money laundering provisions, because a four-level aggravating role enhancement properly applies to Mirzoyan's fraud activities, but not to his money laundering activities. (July 14, 2014 Gov't Ltr. (Dkt. No. 827) at 2; Oct. 20, 2014 Def. Ltr. (Dkt. No. 847) at 16-21) The parties do not address the applicability of a three-level enhancement, which would apply if Mirzoyan was a manager or supervisor of the MTO's money laundering activities.

If either a four-level or three-level aggravating role enhancement applies to Mirzoyan's money laundering activities, his offense level under the Guidelines money laundering provisions is higher than his offense level under the Guidelines fraud provisions, thus mandating that this Court apply the Guidelines money laundering provisions. See U.S.S.G. § 3D1.3(a). Accordingly, this Court must determine (1) whether Mirzoyan was a leader, organizer, manager, or supervisor of the MTO's money laundering activities; and (2) whether the MTO's

money laundering activities involved five or more participants or were otherwise extensive. See U.S.S.G. § 3B1.1(b).

**B.     Applicable Law**

In determining whether a defendant was a "leader" or "organizer" of criminal activity, or a "manager" or "supervisor," the Sentencing Guidelines commentary directs courts to consider

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

U.S.S.G. § 3B1.1, comment. (n.4).

"Distinguishing a 'manager or supervisor' from an 'organizer or leader' may well be more of an art than a science." United States v. Teyer, 322 F. Supp. 2d 359, 364 (S.D.N.Y. 2004) (internal citations omitted). Whether a defendant is considered a leader depends upon "'the degree of discretion exercised by him, the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy.'" United States v. Si Lu Tian, 339 F.3d 143, 157 (2d Cir. 2003) (quoting United States v. Beaulieau, 959 F.2d 375, 379-80 (2d Cir. 1992)). "A defendant is properly considered as a manager or supervisor if he 'exercised some degree of control over others involved in the commission of the offense or played a significant role in the decision to recruit or to supervise lower-level participants.'" United States v. Hertular, 562 F.3d 433, 444-49 (2d Cir. 2009) (quoting United States v. Blount, 291 F.3d 201, 217 (2d Cir. 2002)). The Second Circuit has instructed that "it is enough to manage or supervise a single other participant"

for the three-level enhancement to apply. United States v. Al-Sadawi, 432 F.3d 419, 427 (2d Cir. 2005) (citing United States v. Payne, 63 F.3d 1200, 1212 (2d Cir. 1995)). Moreover, "[t]he fact that other persons may play still larger roles in the criminal activity does not preclude a defendant from qualifying for a [Section] 3B1.1(b) enhancement." Hertular, 562 F.3d at 449 (citing United States v. Wisniewski, 121 F.3d 54, 58 (2d Cir. 1997)).

As to the determination of whether criminal activity involved "five or more participants," the Guidelines commentary explains that "[a] 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant."[24] U.S.S.G. § 3B1.1, comment. (n.1).

### C. Analysis

#### 1. Aggravating Role

Mirzoyan concedes in the Sentencing Agreement that he was an "organizer" or "leader" of the Medicare fraud scheme (see Sentencing Agreement (Dkt. No. 918) at 3; see also Oct. 20, 2014 Def. Ltr. (Dkt. No. 847) at 17), but he argues that he was "not an organizer, leader[,] or manager [of] the [MTO's] money laundering activity." (Oct. 20, 2014 Def. Ltr. (Dkt. No. 847) at 19, 21) Mirzoyan further contends that his leadership role in the MTO's fraud activities "should not be automatically superimposed to the money laundering count of conviction." (Id. at 17) According to Mirzoyan, his "participation within the [MTO's] money

---

[24] The Guidelines commentary further provides that, "[i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1, comment. (n.3).

laundering activities" was limited to his receipt of cash proceeds from the Medicare fraud scheme and to providing proceeds of the fraud to co-conspirators. (See id. at 19-21)

As discussed above, the evidence before the Court demonstrates that money laundering was a critical and essential component of the Medicare fraud scheme. After Mirzoyan and his co-conspirators (1) established the phony clinics through the use of physicians' stolen identifying information; (2) obtained "participating provider" approval from Medicare using the same stolen physician information; (3) submitted fraudulent claims to Medicare using the stolen Medicare beneficiary information; and (4) received payment from Medicare via wire transfers into bank accounts opened with the physicians' stolen identifying information, it was necessary to rapidly transfer these fraudulent proceeds into other accounts that Medicare could not reach (Hrg. Tr. (Dkt. No. 911) at 21, 40; Oct. 8, 2014 Mirzoyan Aff. (Dkt. No. 847-1) ¶ 39)

As Agent Tucci testified at the Fatico hearing, the participants in the Medicare fraud scheme only had a "short-lived time frame" to obtain and secure the fraudulent proceeds from Medicare. (Hrg. Tr. (Dkt. No. 911) at 21) The phony clinics "quickly" engaged in "very high billing," and "eventually Medicare . . . would catch on and shut down the clinic." (Id. at 21, 24) It was therefore necessary "to get the payments in and out before law enforcement could seize the funds once the clinic[s] [were] identified as fraudulent." (Id. at 21; see also Oct. 8, 2014 Mirzoyan Aff. (Dkt. No. 847-1) ¶ 39 (citing risk that Medicare would "claw back money or that the banks would freeze money in the [phony clinics'] accounts")) As Agent Tucci explained,

> [i]n analyzing the . . . bank records [associated with the phony clinics], [she] would see money coming in from Medicare or a contractor for Medicare. And then the money would immediately, almost immediately, be taken right back out, either via check or transfer, to other bank accounts either in individuals' names or other clinics that [were] later identified as fraudulent.

(Hrg. Tr. (Dkt. No. 911) at 21)  The payments from Medicare were ultimately converted to cash, which was sometimes moved "overseas," used to purchase chips at a Las Vegas casino, or used to purchase "gold bars" as "a way to clean the money." (Id. at 40-42; see also Yepiskoposyan Plea Tr. (Dkt. No. 453) at 15)

Mirzoyan claims that he was a mere participant in the MTO's money laundering activities and was not a "leader," "organizer," "manager," or "supervisor" within the meaning of the Guidelines.  According to Mirzoyan, in 2004 – at about the time he first became involved in Medicare fraud – co-defendant Pogos Satamyan[25] introduced him to a group of money launderers that included Karen Markosian and three other individuals who are not named as co-conspirators.  (Oct. 8, 2014 Mirzoyan Aff. (Dkt. No. 847-1) ¶¶ 10, 17-18, 25)  Satamyan told Mirzoyan that the money launderers' duties "included opening accounts and transferring money from account to account until [the money] was actually cashed[, and] . . . extracting cash from the accounts." (Id. ¶ 25)  The money launderers "were paid [a] 25 percent [commission from] the money they cashed." (Id. ¶¶ 25, 43, 45)

---

[25] Satamyan pleaded guilty to RICO conspiracy. (Mirzoyan PSR (Dkt. No. 916) ¶ 22)  During his allocution, Satamyan admitted that

> [b]eginning on a date in or about 2009 and continuing through September 30, 2010, [he] knowingly and willfully conspired with others . . . to engage in Racketeering Activity, specifically money laundering. [He], along with other co-conspirators, conspired and agreed with one another to launder funds that [he] knew were derived from defrauding Medicare. . . .

> [He] knew that the laundered funds were illegal proceeds derived from fraudulent medical clinics, and that the fraudulent medical clinics and illegal proceeds derived therefore were part of an ongoing money laundering scheme in Los Angeles, California, among other locations.

> [He] and [his] co-conspirators knew that the transactions were designed, at least in part, to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the Medicare fraud scheme.

(Satamyan Plea Tr. (Dkt. No. 486) at 10-11)

According to Mirzoyan, although he worked with co-defendants to open the phony clinics used to perpetrate the fraud on Medicare, with respect to the laundering of the proceeds of the Medicare fraud, he "relied exclusively on the knowledge and expertise of the money launderers." (Id. ¶¶ 25, 31-33, 36-37, 43) Mirzoyan contends that these individuals "handled all aspects of opening accounts, moving the funds around[,] and then ultimately extracting the cash." (Id. ¶ 33) Mirzoyan states that he "did not have the knowledge or ability" to perform these transactions; did not have the "wherewithal to direct others on how to complete the money laundering activities"; and "did not exercise decision making authority over the money laundering activities." (Id. ¶¶ 42-44) Although Mirzoyan admits that he "did receive illegal proceeds from the phantom clinics after [the funds] were moved from account to account," his level of participation in and planning of money laundering activities "was no greater than any of [his] partners for a [phony] clinic," and therefore he was not an "organizer," "leader," "manager," or "supervisor" of the MTO's laundering activities within the meaning of the Sentencing Guidelines. (Id. ¶¶ 40, 44)

The evidence before the Court demonstrates that Mirzoyan was much more than a passive recipient of the proceeds from the Medicare fraud scheme, however. Indeed, the evidence shows that Mirzoyan was intimately involved in conducting the MTO's money laundering activities.

As discussed above, at the Fatico hearing the Government introduced a number of intercepted telephone conversations in which Mirzoyan and his co-conspirators discuss the proceeds of the Medicare fraud and the bank accounts through which those proceeds will travel. (See Hrg. Tr. (Dkt. No. 911) at 39-40) These intercepted calls generally involve a discussion of "how much money was coming in [to the bank accounts], [and] identifying [the money that]

should go out." (Id. at 40) Agent Tucci further testified that Mirzoyan can be heard on these calls discussing with co-defendants "how . . . actions [relating to the handling of money] were to be taken." (Id. at 42)

As an initial matter, the intercepted telephone conversations demonstrate that Mirzoyan was intimately involved in the opening of bank accounts that were used to move money derived from the Medicare fraud. Some of these intercepted conversations are between Mirzoyan and co-defendant Vartan Boyadzhyan, who played a "key role" in the racketeering enterprise by "assuming the identities of others and opening bank accounts for . . . fraudulent medical clinics to receive Medicare proceeds." (Mirzoyan PSR (Dkt. No. 916) ¶ 78; see also Hrg. Tr. (Dkt. No. 911) at 42-43) In these conversations, the two men discussed "if an account was [to be] opened, when it would be opened," "how much money was coming in," "when [the account] was clear, . . . [and] whether the account had been shut down yet by law enforcement or the bank." (Id. at 43; see also GX 34 (Call No. 17570) (Boyadzhyan provides Mirzoyan **with** account information for new bank accounts in Kentucky and South Carolina associated with Mirzoyan's "business[es]")) In their telephone calls, Boyadzhyan is typically "getting guidance from . . . Mirzoyan" about the opening and management of bank accounts. (Hrg. Tr. (Dkt. No. 911) at 43)

For example, in a December 17, 2009 call with a bank employee, Mirzoyan works with Boyadzhyan – who is on another telephone line – to open a new bank account. (See GX 22 (Call No. 6473)) Mirzoyan tells the bank employee that the account will receive about $100,000 in monthly direct deposits from Medicare, and have an average monthly balance of about $20,000. (Id. at 3-6) Establishing bank accounts for the phony clinics was both essential to the Medicare fraud scheme and the first step in the money laundering scheme, which involved the

rapid transfer of Medicare payments from accounts associated with the phony clinics to other accounts beyond the reach of Medicare.

The intercepted telephone conversations also show that Mirzoyan exercised decision making authority over, and gave others direction concerning, the management of bank accounts and the movement of funds contained in those accounts. For example, on November 9, 2009, Anna Termartirosyan – Mirzoyan's wife and co-defendant – called Mirzoyan about an inquiry from Citibank regarding a deposit made in a bank account two months earlier. (GX 15 (Call Nos. 3660) at 2; GX 16 (Call No. 3662) at 3) Citibank sought information about who made the deposit and the source of the money. (GX 15 at 2) Mirzoyan explains to Termartirosyan that the bank is "on alert" because the deposit was made in cash. He tells Termartirosyan to maintain her story that the money came from the sale of personal jewelry, and not to present a more elaborate tale involving others to the bank. (See GX 16 at 2-5)

Similarly, on December 22, 2009, Mirzoyan called co-defendant Karen Simonian to discuss using a "new . . . money launderer" to assist in the money laundering scheme. (GX 11 (Call No. 7007) at 6-8; Hrg. Tr. (Dkt. No. 911) at 50) The two agree to "start working with him" and "see how it works," but to start "small" and "slowly" and "see [if] he owns up to his word." (GX 11 at 7-8) It is clear from the conversation that Mirzoyan makes the final decision as to whether to involve the new launderer, and it is Mirzoyan who has developed the strategy as to how deposits will be made in the new account:

DM:    Then I will give it to them. Let me – let's see how they work. Let's try.

KS:    Yeah, of course. Yeah, right.

DM:    I should give it as 2 and 3, right? Small and little. I shouldn't give big.

KS:    I don't know. . . .

. . . .

DM:     I want to train the bank. I don't want to – with a big check. Ours – our
        bank, not his.

KS:     Yeah, yeah.

DM:     If it is big, they might say, what is this, what –

KS:     Mm-hmm.

DM:     You get what I'm saying, right?

KS:     Yeah.

DM:     We shouldn't be in the center of attention for no reason, bro.

. . . .

KS:     We can even ask him how he wants it. Like, we can give it 5-5 – like that.

DM:     Yeah, something like that.

(Id.)

On January 14, 2010, Mirzoyan received a call from co-defendant Armen

Grigorian and an unidentified man. The two men tell Mirzoyan about a possible investigation

into one of the MTO's bank accounts, and that the bank has called about the account. (GX 11

(Call No. 9550) at 9-11) Mirzoyan asks whether "the account [is] open or closed," and instructs

Grigorian that "[i]f it is open, then let it stay open," because "[b]y the time they get to the

investigation, you know it will [be] two month[s]. Let them check, so what." (Id. at 9)

On January 19, 2010, Mirzoyan spoke with co-defendant Karen Markosian,

whose "role . . . was to assist in laundering . . . funds" and to "move the money from . . . [the

bank accounts of] phantom clinic[s] into either [the account of] another clinic or . . . [to] extract

it [as] cash." (GX 11 (Call No. 10054) at 12-13; Hrg. Tr. (Dkt. No. 911) at 47-48) The two men

discuss an account from which "60 and change came out," and Markosian asks Mirzoyan "what

to do with the rest." (GX 11 at 12-13)  Mirzoyan agrees that the money "must go" and that "[s]omone must go in and take out cash." (Id.)  Mirzoyan then questions Markosian about other accounts.  Mirzoyan had expected money from Markosian that day, but Markosian told him it was "too soon" and that he did not want to be "too aggressive [in his withdrawals] to raise questions." (Id.)  Markosiàn reports to Mirzoyan that he will "finish the 90 this week." (Id.)

There is also evidence that Mirzoyan directed other co-conspirators to transfer proceeds from the Medicare fraud "overseas." (See Hrg. Tr. (Dkt. No. 911) at 40; see also GX 13 (November 3, 2009 call in which Mirzoyan tells co-defendant Manuk Muradakhanyan that he "need[s] to send money to Yerevan" – the capital of Armenia – and speaks with Muradakhanyan about sending "25-ish" to that city); Muradakhanyan Plea Tr. (Dkt. No. 470) at 10-11 (allocution in which Muradakhanyan states that in November 2009 he received money from a member of the MTO which he "believed to be proceeds of a crime," and that on behalf of that individual he "made the same sum of money available in Yerevan, Armenia")  For example, on April 23, 2010, Mirzoyan "arranged for [co-defendant] Pogos Satamyan to transport $9,800 in cash, along with a check in an amount exceeding $20,000, from the U.S. to Armenia." (Mirzoyan PSR (Dkt. No. 916) ¶ 70)  In an intercepted phone call on that same day, Mirzoyan instructs Termartirosyan to count out and separate "five thousand" dollars in cash from a bag in their home, and tells her that another individual will "give [her] twenty more now." (GX 32 at 2-3)  Mirzoyan also tells Termartirosyan that "Pogos [Satamyan] will come and take it."[26] (Id. at 3-4)

---

[26] Mirzoyan argues that his relationship with co-defendant Satamyan demonstrates that he did not supervise any aspect of the MTO's money laundering activities. (See Oct. 20, 2014 Def. Ltr. (Dkt. No. 847) at 17-21)  Mirzoyan contends that Satamyan introduced Mirzoyan to the Medicare fraud and money laundering scheme, and introduced him to the individuals used to launder the fraud proceeds.  According to Mirzoyan, he and Satamyan split profits from phony clinics that they opened together. (Oct. 8, 2014 Mirzoyan Aff. (Dkt. No. 847-1) ¶¶ 18, 22-25)  With respect to the April 23, 2010 telephone call between himself and Termartirosyan, Mirzoyan

Considered together, the intercepted telephone calls demonstrate – by a preponderance of the evidence – that Mirzoyan's role in the MTO's money laundering activities warrants an aggravating role enhancement, and that he is properly considered a "manager" or "supervisor" of the MTO's money laundering activities for Guidelines purposes.

Given the decisions he made and the direction he provided, the intercepted calls demonstrate that Mirzoyan "had greater responsibility over the organization's [money laundering] operations than an average member of the conspiracy." Hertular, 562 F.3d at 449 (applying three-level enhancement for role as "manager" or "supervisor" in drug conspiracy where, inter alia, defendant "recruited and directed persons involved in transporting drugs for the conspiracy"). Moreover, in order for this Court to find that Mirzoyan was a "manager" or "supervisor" of the MTO's money laundering activities under U.S.S.G. 3B1.1(b), "it is enough [that he] manage[d] or supervise[d] a single other participant." Al-Sadawi, 432 F.3d at 427. Here, the intercepted calls repeatedly show Mirzoyan directing the money laundering activities of others, and at times deciding who would actually launder the fraud proceeds, when that would occur, how that would occur, and how much money would be laundered. This exercise of discretion and decision making authority is, of course, fully consistent with Mirzoyan's admitted

---

argues – without supporting evidence – that the call shows only that Satamyan was stopping by to pick up his share of the profits. (Oct. 20, 2014 Def. Ltr. (Dkt. No. 847) at 20-21) Mirzoyan also argues that other intercepted calls "clarif[y] the pecking order" and show Mirzoyan "reporting to Satamyan" and bringing him his share of the profits from phony clinics that they opened together. (Id.) (emphasis in original)

"There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, comment. (n.4). Moreover, "[t]he fact that other persons may play still larger roles in the criminal activity does not preclude a defendant from qualifying for a [Section] 3B1.1(b) enhancement [as a manager or supervisor]." Hertular, 562 F.3d at 449. Accordingly, even assuming that Satamyan was a leader or organizer of the MTO's money laundering activities, that fact is not dispositive of Mirzoyan's own role as a leader, organizer, manager, or supervisor of the money laundering activities.

role as the leader of the racketeering enterprise's larger Medicare fraud scheme, of which the enterprise's money laundering activities were an integral component.

Accordingly, the Court finds that Mirzoyan was a manager or supervisor of the racketeering enterprise's money laundering activities for purposes of Section 3B1.1(b).

## 2. **Five or More Participants**

The evidence likewise demonstrates that the MTO's money laundering scheme "involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). As noted above, a "participant" is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, comment. (n.1). Here, the record shows that the following defendants, among others, participated in the MTO's money laundering activities: Mirzoyan, Karen Markosian, Pogos Satamyan, Karen Simonian, Anna Termartirosyan, Gourgen Mirimanian, Jacob Pogosian, Artur Yepiskoposyan, Robert Terdjanian, and Manuk Muradakhanyan,. Indeed, neither Mirzoyan nor the Government argues that the MTO's money laundering activities involved less than five participants.

As to Markosian and Satamyan, Mirzoyan states in his affirmation that Satamyan – who had previously engaged in Medicare fraud and who joined Mirzoyan in the MTO's Medicare fraud – introduced Markosian to him as a money launderer. Mirzoyan then utilized Markosian to launder the fraud proceeds obtained from Medicare. (Oct. 8, 2014 Mirzoyan Aff. (Dkt. No. 847-1) ¶¶ 17-18, 22, 25, 33, 43) In intercepted telephone calls introduced by the Government, Mirzoyan and Markosian discuss money laundering activities and, in particular, the extraction of cash proceeds derived from the Medicare fraud. (GX 11 (Call No. 10054) at 12-13) The Court concludes that both Markosian and Satamyan were participants in the MTO's money laundering activities.

As to Simonian, the Government introduced a December 22, 2009 phone call in which Mirzoyan and "Simonian . . . work[ed] together to launder the proceeds [of the Medicare fraud]." (Hrg. Tr. (Dkt. No. 911) at 50-51) During the call, Simonian and Mirzoyan discuss using a "new . . . money launderer" for a percentage fee, and discuss giving him a small amount of money to start out, in part to "see [if] he owns up to his word" and in part to avoid attracting attention from the bank. (Id.; GX 11 (Call No. 7007) at 7-8) The Court concludes that Simonian was a participant in the MTO's money laundering activities.

As to Termartirosyan, the record shows that she assisted in the movement of cash proceeds from the Medicare fraud between bank accounts. Indeed, some of the fraud proceeds were deposited into her bank accounts. (See GX 15, GX 16) The evidence also shows that she assisted Mirzoyan in his efforts to direct some of the fraud proceeds to Armenia. (See Mirzoyan PSR (Dkt. No. 916) ¶ 70; GX 32) The Court concludes that Termartirosyan was a participant in the MTO's money laundering activities.

As to Mirimanian,[27] during his allocution he admitted that he "agree[d] to monitor the bank account balances for [his] co[-]conspirators and give them updates on the bank account[s] and the balances of the accounts, knowing that . . . [t]he information [he] provided allowed [his] co[-]conspirators to withdraw funds from the account which were illegally obtained through fraudulent medical billing." (Mirimanian Plea Tr. (Dkt. No. 659) at 4-5) At the Fatico hearing, Gayane Khachaturyan testified that while she was employed at Mirzoyan's Glendale, California office, Mirimanian also worked at the office "[a]lmost every day." (See Hrg. Tr. (Dkt. No. 911) at 63, 66, 69, 92) She "would hear . . . Mirimanian pretend to be an office manager on the phone [with banks]," and "would hear him ask questions [as] to why checks were not

---

[27] Mirimanian pleaded guilty to RICO conspiracy. (Mirzoyan PSR (Dkt. No. 916) ¶ 30)

clearing [the accounts]." (Id. at 106) On one occasion, Khachaturyan also heard Mirimanian speaking to a bank "regarding a freeze on an account." (Id.) The Court concludes that Mirimanian was a participant in the MTO's money laundering activities.

As to Pogosian, during his allocution he stated that he "agreed to assist [the MTO] enterprise through a number of acts of money laundering[,] in that during the period of 2008 through 2010 [he] issued in excess of $10,000 to three co[-]defendants totaling approximately $350,000 together with IRS 1099 forms in exchange for cash back from these co-defendants. [He] reasonably knew that the cash [he] received constituted proceeds from Medicare fraud and money laundering. [His] provision of the checks enabled recipients to fraudulently claim a legitimate source of income." (Pogosian Plea Tr. (Dkt. No. 469) at 13) The Court concludes that Pogosian was a participant in the MTO's money laundering activities.

As to Yepiskoposyan, he admitted during his allocution that "[d]uring 2009 and 2010, [he] was a member of the [MTO] enterprise and aided other members to conduct financial transactions with the proceeds from the fictitious Medicare billings conducted by the enterprise, including using millions of dollars of chips from Las Vegas casinos to disguise the illegal proceeds and transferring illegal proceeds to other persons and bank accounts in the names of aliases and phony accounts. [He] aided the above-referenced financial transactions in order to promote and conceal the carrying on of the multiple acts consisting of [a] pattern of racketeering activity alleged in Count One of the Indictment." (Yepiskoposyan Plea Tr. (Dkt. No. 453) at 15) The Court concludes that Yepiskoposyan was a participant in the MTO's money laundering activities.

As to Robert Terdjanian, who pleaded guilty to RICO conspiracy (see Robert Terdjanian Plea Tr. (Dkt. No. 385) at 22), he admitted during his plea allocution that he "agreed

to participate, and participated, in a scam to defraud Medicare by assisting co[-]defendant, Davi[t] Mirzoyan in opening up three bank accounts in New York City in the name of people and entities [he] did not know. These entities were Alter Family, Inc., Breslow Medical PC, and MK Hearing Center, Inc. Some checks for monies received in [these] bank accounts from Medicare were given to [him] and [he] deposited these checks into other bank accounts that [he] controlled. The vast majority of the monies [he] received from these entities were withdrawn and distributed to other individuals and entities."[28] (Id. at 18-19) Terdjanian further admitted that he was aware at the time that the monies he had received had been fraudulently obtained from Medicare. (Id.) The Court concludes that Robert Terdjanian was a participant in the MTO's money laundering activities.

As to Muradakhanyan, in a November 3, 2009 call, Mirzoyan told him that he "need[ed] to send money to Yerevan[, Armenia]," and the two men discussed sending "25-ish" to Armenia. (GX 13 (Call No. 3191) at 2-3) Mirzoyan tells Muradakhanyan that "[he] will have saved [Mirzoyan] big time" by assisting with the movement of the money. (Id.) Muradakhanyan – who pleaded guilty to RICO conspiracy – stated during his plea allocution, that "in November 2009, [he] received money in Los Angeles which [he] believed to be proceeds of [a] crime and on behalf of an individual . . . associated with the enterprise. . . . [He] made the same sum of money available in Yerevan, Armenia." (Muradakhanyan Plea Tr. (Dkt. No. 470) at 11) The Court concludes that Muradakhanyan was a participant in the MTO's money laundering activities.

---

[28] The three entities referenced by Terdjanian were phony clinics associated with the MTO. (See July 9, 2013 Gov't Ltr. (Dkt. No. 701) ("Billing Chart"); see also Oct. 20, 2014 Def. Ltr. (Dkt. No. 847) at 9-10; Oct. 8, 2014 Mirzoyan Aff. (Dkt. No. 847-1) ¶ 37)

In sum, there is overwhelming evidence that the MTO's money laundering activities involved at least five participants.

*      *      *      *

This Court concludes that a three-level enhancement applies pursuant to Section 3B1.1(b), because Mirzoyan was a "manager or supervisor" of money laundering activity that involved five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1(b). Moreover, because application of the Guidelines' money laundering provisions results in a higher offense level and sentencing range than application of the Guidelines' fraud provisions, the Guidelines' money laundering provisions will be utilized in calculating Mirzoyan's Guidelines range. See U.S.S.G. § 3D1.3(a).

## VII.   ENHANCEMENT FOR $1 MILLION IN GROSS RECEIPTS

The Government's Pimentel letter and the PSR apply a two-level enhancement based on the finding that Mirzoyan "derived more than $1 million in gross receipts from one or more financial institutions as a result of the offense." (May 1, 2012 Gov't Ltr. (Dkt. No. 917) at 4; Mirzoyan PSR (Dkt. No. 916) ¶ 116)  The parties contend that this enhancement is not applicable, because Medicare does not qualify as a "financial institution." (July 14, 2014 Gov't Ltr. (Dkt. No. 827) at 3; Oct. 20, 2014 Def. Ltr. (Dkt. No. 847) at 36)

The "gross receipts" enhancement in the 2016 Guidelines Manual provides for a two-level enhancement where "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." U.S.S.G. § 2B1.1(16)(A).  The commentary to Section 2B1.1 defines "financial institution" as including

> any institution described in 18 U.S.C. § 20, § 656, § 657, § 1005, § 1006, § 1007, or § 1014; any state or foreign bank, trust company, credit union, insurance company, investment company, mutual fund, savings (building and loan) association, union or employee pension fund; any health, medical, or hospital

70

insurance association; brokers and dealers registered, or required to be registered, with the Securities and Exchange Commission; futures commodity merchants and commodity pool operators registered, or required to be registered, with the Commodity Futures Trading Commission; and any similar entity, whether or not insured by the federal government. "Union or employee pension fund" and "any health, medical, or hospital insurance association," primarily include large pension funds that serve many persons (e.g., pension funds of large national and international organizations, unions, and corporations doing substantial interstate business), and associations that undertake to provide pension, disability, or other benefits (e.g., medical or hospitalization insurance) to large numbers of persons.

U.S.S.G. § 2B1.1, comment. (n.1).

Courts have held that Medicare does not qualify as a "financial institution" under the Guidelines. See United States v. Sirotina, 318 F. Supp. 2d 43, 46 (E.D.N.Y. 2004) (Medicare is not a "financial institution" under the Guidelines) (citing United States v. Soileau, 309 F.3d 877, 881 (5th Cir. 2002)); Soileau, 309 F.3d at 881 ("[T]he list of 'financial institutions' Congress directed, by referencing [18 U.S.C. § 20], to be encompassed by the guideline is not as broad as the Sentencing Commission's definition [in the application notes] and does not include, either explicitly or implicitly, the Medicare Program. . . . Nor is Medicare listed anywhere in the sections cross referenced in the congressional directive[, the Crime Control Act of 1990]. . . . Likewise, nowhere in the entire United States Code is there a definition of 'financial institution' that includes the Medicare program.") (citations omitted).[29]

This Court concludes that the Medicare Program is not a "financial institution" for purposes of the Sentencing Guidelines. Because the Government does not contend that

---

[29] At the time Sirotina and Soileau were decided, the "gross receipts" enhancement was found in Section 2F1.1(b)(8) of the Guidelines. That section provided for a four-level enhancement "[i]f the offense . . . affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense." Sirotina, 318 F. Supp. 2d at 44. The Application Note defining "financial institution" is substantially the same as the current Application Note defining "financial institution." Accordingly, the analysis in these cases regarding Section 2F1.1(b)(8) is applicable here. See United States v. Miles, 360 F.3d 472, 481 (5th Cir. 2004) (applying Soileau rationale to the "gross receipts" enhancement set forth in Section 2B1.1).

Mirzoyan derived more than $1 million in gross receipts from any entity other than Medicare, this enhancement does not apply in calculating his Guidelines range.

## CONCLUSION

For the reasons stated above, this Court will:

(1) apply the November 1, 2016 Guidelines Manual in sentencing Mirzoyan;

(2) adopt the parties' stipulated loss amount of $20 million to $50 million;

(3) impose a twenty-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(K), based on a loss amount of between $9.5 million and $25 million;

(4) impose a two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because Mirzoyan's offenses involved more than 10 victims;

(5) impose a four-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(7), because Mirzoyan was convicted of a federal health care offense and the offense involved a loss amount of more than $20 million;

(6) impose a two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i), because Mirzoyan's offenses involved the unauthorized use of a means of identification unlawfully to obtain another means of identification;

(7) apply the Guidelines money laundering provisions (see U.S.S.G. § 2S1.1) in calculating Mirzoyan's Guidelines range, because they yield the highest offense level and sentencing range (see U.S.S.G. § 3D1.3(a)) ;

(8) impose a three-level enhancement for aggravating role pursuant to U.S.S.G. § 3B1.1(b), because Mirzoyan was a manager or supervisor of the racketeering enterprise's money laundering activity, and that activity involved five or more participants or was otherwise extensive; and

(9) not impose an enhancement pursuant to U.S.S.G. § 2B1.1(16)(A) for deriving more than $1 million in gross receipts from a financial institution as a result of the offense, because Medicare is not a "financial institution" within the meaning of the Sentencing Guidelines.

The complete Guidelines analysis is as follows: As discussed above, Counts One, Two, Three, and Five of the Indictment are grouped together, pursuant to Section 3D1.2(d), because the offense level for those counts is based on the total amount of loss. See U.S.S.G.

§ 3D1.2(d). Count Four is also grouped with those counts because the money laundering offense is related to the funds derived from the fraud offenses. See U.S.S.G. § 2S1.1, comment. (n.6); § 3D1.2(c). Pursuant to Section 3D1.3(a), the offense level applicable to any group of offenses is "the offense level . . . for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group." U.S.S.G. § 3D1.3(a). The Guidelines money laundering provisions – U.S.S.G. § 2S1.1 – will be applied because they result in the highest offense level and sentencing range.

Pursuant to Section 2S1.1(a)(1) – because Mirzoyan "committed the underlying [fraud] offense[s]" and "the offense level for [those] offense[s] can be determined" – the base offense level is the offense level for the underlying offense from which the laundered funds were derived. U.S.S.G § 2S1.1(a)(1). The guideline applicable to the underlying racketeering offenses is Section 2B1.1. Accordingly, the base offense level is 7. See U.S.S.G. § 2B1.1(a)(1).

The following enhancements apply to the base offense level: a twenty-level enhancement pursuant to Section 2B1.1(b)(1)(K), based on a loss amount of between $9.5 million and $25 million; a two-level enhancement pursuant to Section 2B1.1(b)(2)(A)(i), because Mirzoyan's offenses involved 10 or more victims; a four-level enhancement pursuant to Section 2B1.1(b)(7), because Mirzoyan was convicted of a federal health care offense and the loss amount is more than $20 million; a two-level enhancement pursuant to Section 2B1.1(b)(10)(C), because Mirzoyan's offense involved sophisticated means;[30] and a two-level enhancement pursuant to Section 2B1.1(b)(11)(C)(i), because Mirzoyan's offense involved the unauthorized

---

[30] Throughout these proceedings, it has been undisputed that the "sophisticated means" enhancement is applicable. (May 1, 2012 Gov't Ltr. (Dkt. No. 917) at 4); Mirzoyan PSR (Dkt. No. 916) ¶ 114; Sentencing Agreement (Dkt. No. 918) at 3)

use of a means of identification unlawfully to obtain another means of identification. Accordingly, the base offense level under the Guidelines money laundering provisions is 37.

This Court must also apply the specific offense characteristics and appropriate adjustments under the Guidelines money laundering provisions. Pursuant to U.S.S.G. § 2S1.1(b)(2)(B), the base offense level is increased by two levels because Mirzoyan was convicted under 18 U.S.C. § 1956. A three-level enhancement for aggravating role is also applied pursuant to U.S.S.G. § 3B1.1(b), because Mirzoyan was a "manager" or "supervisor" of the racketeering enterprise's money laundering activity, which involved five or more participants or was otherwise extensive. Finally, Mirzoyan's adjusted offense level under the Guidelines' money laundering provisions is reduced by three levels due to his acceptance of responsibility, pursuant to Sections 3E1.1(a) and (b). Accordingly, Mirzoyan's total offense level is 39.

As to Criminal History Category, Mirzoyan receives one point for a prior conviction, and two points because he was on probation at the time he committed the instant offenses. (Mirzoyan PSR (Dkt. No. 916) ¶¶ 128-132) Three criminal history points corresponds with Criminal History Category II.

Because Mirzoyan's total offense level is 39 and he is in Criminal History Category II, the applicable sentencing range under the 2016 Guidelines Manual is 292 to 365 months' imprisonment.

Dated: New York, New York
April 25, 2017

SO ORDERED.

Paul G. Gardephe
Paul G. Gardephe
United States District Judge